David GREEN, et al., Plaintiffs,

v.

The CITY OF MONTGOMERY, ETC., et al., Defendants.

Civ. A. No. 88–T–1160–N.

United States District Court, M.D. Alabama, N.D.

March 27, 1992.

Order, April 17, 1992.

Vanzetta Penn McPherson, Montgomery, Ala., for plaintiffs and the plaintiff class.

Robert C. Black, Terry A. Sides, Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiffs David Green and Jerry Hankins, two police officers with the Montgomery City Police Department, have brought this class-action lawsuit charging the defendants—Mayor Emory Folmar, Police Chief John Wilson, and the City of Montgomery, Alabama—with violation of rights given and protected under the first and fourteenth amendments to the United States Constitution as enforced through 42 U.S.C.A. § 1983 (West 1981). Green and Hankins claim that the defendants have subjected them and other officers to a variety of adverse employment actions, including disadvantageous transfers and assignments, unwarranted discipline, and denial of promotions, because of their speech, associational activities, and participation in litigation against defendants. They are pursuing claims on behalf of 15 persons— their own claims and the individual claims of 13 other class members—as well as a broad class-wide claim that Folmar and Wilson have engaged in a "pattern and practice" of retaliation against officers for exercising their first-amendment freedoms. They have invoked the jurisdiction of the court pursuant to 28 U.S.C.A. §§ 1331 (West Supp.1991) and 1343 (West Supp. 1991). The court has certified a plaintiff class of all past, present, and future Mont-

gomery Police Department employees as of January 9, 1984.[1]

Based on trial evidence that included over 40 witnesses and a mound of documentary evidence several feet in height, the court concludes that one police officer is entitled to full relief, that one officer is entitled to partial relief, that whether two officers are entitled to any relief cannot be determined from the present record, and that the remaining eleven officers are not entitled to any relief. The court further concludes that the plaintiff class is entitled to recover on only the narrow claim that defendants have retaliated against its members for taking part in lawsuits unfavorable to or critical of Folmar's or Wilson's policies and decisions in the area of police employment.[2]

## I. BACKGROUND

It is somewhat of an understatement to say that the court does not write on a clean slate in considering Green and Hankins's first-amendment claims against Folmar and Wilson. Since the early 1980's, city and police department officials have been the frequent target of successful retaliation challenges brought by police officers, principally under the headings of three cases: *Jordan v. Wilson*, civil action no. 75–19–N; *United States v. City of Montgomery*, civil action no. 3739–N; and *Eiland v. City of Montgomery*, civil action no. 84–T–120–N. Because the acts of retaliation addressed in these cases were committed by, or at the instigation of, Folmar or Wilson and because most of the claims asserted by the plaintiffs are either directly or indirectly factually related to these cases, any fair consideration of the plaintiffs' claims must begin with these three cases.

### A. *Jordan v. Wilson and United States v. City of Montgomery*
#### 1. Pierce–Hanna

In 1986, in response to a complaint filed in *Jordan v. Wilson*, civil action no. 75–19–N, by Sandra Pierce–Hanna on behalf of herself and other female officers in the Montgomery Police Department, the court held that the department had systematically and intentionally discriminated against female officers in promotions, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the equal protection clause of the fourteenth amendment as enforced through § 1983.[3] *Jordan v. Wilson*, 649 F.Supp. 1038 (M.D.Ala.1986). The court found that "discriminating against women because they are women was and remains the 'standard operating procedure' within the City of Montgomery Police Department." *Id.* at 1058. The court ordered the department to develop new promotion procedures. *Id.* at 1063.

The court also found that Mayor Folmar had "concocted a department-wide scheme to discredit and embarrass ... Pierce[–Hanna] for having initiated the charges." *Jordan v. Wilson*, 667 F.Supp. 772, 776 (M.D.Ala.1987). As later capsulized by the court, the evidence relied upon in reaching this finding was as follows:

"Receiving their cue from the mayor, Pierce[–Hanna]'s supervisors suddenly began to give her extremely poor ratings, with the result that her ranking on

1. The court initially certified a class of employees dating back to 1982, *see* Order dated March 21, 1989, but later determined that the applicable statute of limitations extended only as far back as January 9, 1984. *See* Order dated March 4, 1991. *See also Sims v. Montgomery County Commission*, 766 F.Supp. 1052, 1081–84 (M.D.Ala.1990) (court reached same conclusion with regard to statute of limitations in race and sex discrimination case based on § 1983). Despite the January 9, 1984, cut-off date, the court has considered relevant evidence of prior acts of discrimination by defendants as background evidence to show independently actionable conduct occurring within the limitations period. *See United Air Lines v. Evans*, 431 U.S. 553, 558,

97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Walker v. Jefferson County Home*, 726 F.2d 1554, 1557 (11th Cir.1984); *Jordan v. Wilson*, 649 F.Supp. 1038, 1046 (M.D.Ala.1986).

2. Although the plaintiffs initially rested their case also on certain administrative regulations issued by the Montgomery City–County Personnel Board, they acknowledged at trial that these regulations were no more protective than the first amendment and that the court could therefore exclusively consider their individual and class claims under the first amendment.

3. Title VII is codified at 42 U.S.C.A. §§ 2000e through 2000e–17 (West 1981).

the promotion register dropped precipitously and dramatically. The scheme was thus not subtle and hidden, but open, obvious and widespread so that everyone in the department could see that the penalty for 'disloyalty' was very great. It was based on open intimidation and had a two-fold purpose: first to punish Pierce–[Hanna] and force her out of the department; and second, to force others in the department to join the mayor in his vendetta against Pierce[–Hanna] and in his opposition to her lawsuit.

"The scheme, however, also had an element of reward to it. On one occasion the mayor rewarded two female officers for supporting him against Pierce[–Hanna], by promoting them while rejecting Pierce[–Hanna]."

*Id.* (citation omitted). Because "there [was] a strong probability of further retaliation" and because an injunction banning retaliation was not already outstanding, the court issued an order prohibiting Mayor Folmar and all police officials from retaliating against persons in the department and, in particular, from retaliating against Pierce–Hanna. *Jordan v. Wilson*, 649 F.Supp. at 1064.

At the time of this litigation, the promotion process in the Police Department was not based on objective standards of performance, but rather essentially reflected the personal choices of Folmar. The department ranked its law-enforcement personnel as follows from lowest to highest: police officer, corporal or investigator; sergeant; lieutenant; captain; major; deputy chief; and chief. The process for promotion was identical for all ranks from sergeant through major. Every year, the Montgomery City–County Personnel Board compiled a list of police officers who sought and were eligible for promotion. The only requirement for eligibility was one or two years of service in the next lower rank. The Personnel Board then sent this list to the Police Department, where it was distributed to each of six division commanders.[4] The division com-

manders, who usually held the rank of major, gave each applicant a numerical rating between one (lowest) and ten (highest) and the police chief and the deputy chief together gave each applicant a similar rating. The chief or deputy chief then averaged the seven ratings so that each applicant had one rating between one and ten. Based on these ratings, the Personnel Board prepared a register of all applicants rated from highest to lowest for each rank. Where two applicants had the same rating, the one with greater seniority was placed higher. According to law, the mayor alone was authorized to promote employees in the Police Department. When there was a vacancy that the department wished to fill by promotion, the mayor asked the Personnel Board to provide a certification of applicants off the register for the rank being considered. The standard certification contained the names of the five highest rated officers on the register for the relevant rank. The mayor then selected for promotion any one of the five applicants from the certification he had requested.

Mayor Folmar, who had served as mayor since 1977, did "not view his authority to promote within the police department as titular, as routinely accepting the recommendations of the police chief." *Jordan v. Wilson*, 649 F.Supp. at 1048. Rather, he was "directly, personally, and intimately involved in the day-to-day operations of the department, so much so that his relationship with the department [was] more that of a 'super-chief of police' rather than that of an external executive who merely sets policy." *Id.* He "therefore always had a profound effect on how officers [were] rated by the police chief, his deputy, and the commanders; and Folmar's promotion selections from the certifications ... usually reflected his own personal choices." *Id.*

In May 1987, the court approved and ordered implemented an interim plan for promotions in the Police Department. Because the department was subject to outstanding orders in a companion case prohibiting racial discrimination in hiring and

---

4. The Department today is divided into eight divisions: patrol, detective, juvenile, training, recruiting, traffic, records and communications, and administrative.

promotions, *United States v. City of Montgomery*, civil action no. 3739–N, the relief also applied to this companion case.[5] Under the plan, "if the mayor chooses to select a lower-ranked candidate over a higher-ranked candidate, even if all the candidates involved are women, he must state in writing his reasons for rejecting the higher-ranked candidate." *Jordan v. Wilson*, 667 F.Supp. at 777. The female police officers are then given a period of time to challenge the objection as either sexually discriminatory or retaliatory. If an objection is made, "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge." *Id.* These provisions were based on findings that Mayor Folmar and others had engaged in a longstanding scheme against Pierce–Hanna and other female officers "to discourage [them] from pursuing discrimination claims and to retaliate against those who do." *Id.* at 776.

At the trial on Pierce–Hanna's complaint in 1985, Chief Wilson, who was then only a major in the department, testified that, because Pierce–Hanna had brought a lawsuit against the department, he could not be objective in his assessment of her performance as an officer. Upon hearing Wilson's testimony, the department's then-Chief of Police prohibited Wilson from having any future input into the required periodic departmental evaluations of Pierce–Hanna. Later, in January 1987, based on Wilson's testimony, the court approved a decree, submitted by counsel for Pierce–Hanna and for the defendants, which provided, among other things, that "the current Chief of Police, John Wilson, will not be involved in any selection process in which Pierce–Hanna has applied for promotion." *Jordan v. Wilson*, civil action no. 75–19–N at p. 2 (M.D.Ala. January 14, 1987).

The court later learned in 1991 that Mayor Folmar's bias toward Pierce–Hanna was even stronger than the court had realized. Later evidence revealed that, during the trial on Pierce–Hanna's claims in 1985, Folmar commented to some police officers that

"he would fall on his sword and die before he would promote her."

### 2. Pierce–Hanna, Lisenby, Williams, and Gamble

In 1989, one of the Police Department's two deputy chiefs announced that he intended to retire. Chief Wilson appointed Roger Owens, a white male, as "deputy-chief designate," to assume the new position when the retiring deputy chief left on September 29, 1989.

In June 1989, in response to challenges to the appointment made by four majors—Pierce–Hanna, Irma Lisenby, Sidney Williams, and James Gamble—the court preliminarily found that Chief Wilson had appointed Owens, and had refused to consider and select one of the four other police officers in retaliation for the four officers' prior participation in this litigation. *United States v. City of Montgomery*, civil action nos. 3739–N and 75–19–N (M.D.Ala. June 21, 1989). Wilson testified that one of the reasons he had selected Owens was because he was not "controversial"—that is, according to Wilson, because "He's never been the center of controversy in any of these proceedings or any others." *Id.* at 6. The court understood Wilson to mean "that he wanted someone unconnected with this litigation, someone who had not become controversial through his or her support for, or opposition to, these cases—in short someone other than [the four complaining] officers." *Id.*

The court entered a preliminary injunction requiring that Folmar and Wilson develop an interim selection plan that would allow all eligible officers, including the four complaining officers and Owens, to compete for the deputy-chief position without regard to a candidate's sex, race, or connection with this litigation. The court further required that Folmar and Wilson vacate the appointment of Owens pending court resolution of the challenges to the appointment. Owens was allowed to continue as acting deputy chief only.

---

**5.** *See Sims v. Montgomery County Commission,* 686 F.Supp. 878, 880 (M.D.Ala.1988) (discussing history of race discrimination case).

In August 1989, the court entered a memorandum opinion and injunction making final its earlier preliminary finding of retaliation against Pierce–Hanna and the other three officers. The court concluded that "Wilson intended to choose only someone for deputy chief who had not in the past participated in lawsuits challenging the employment practices of the police department." *United States v. the City of Montgomery*, 744 F.Supp. 1074, 1080–81 (M.D.Ala.1989). The court continued its injunction against the appointment of Owens and continued its requirement that Mayor Folmar and Chief Wilson develop an interim plan for selection of deputy chief. *Id.* at 1088. The defendants appealed, and the Eleventh Circuit Court of Appeals affirmed the court's final injunction. *United States v. City of Montgomery*, 911 F.2d 741 (11th Cir.1990) (table).

### 3. Pierce–Hanna

In August 1990, after the Eleventh Circuit had affirmed the final order requiring that the defendants establish new procedures for selecting a new deputy chief, this court approved and adopted an interim selection plan. *United States v. City of Montgomery*, civil action nos. 3739–N and 75–19–N (M.D.Ala. August 2, 1990). The plan was substantially parallel to the court-ordered interim-promotion plan previously adopted for ranks below that of deputy chief, with the exception that its reach was expanded to allow black officers as well as female officers to seek immediate court relief should the defendants discriminate or retaliate against them. Paragraph 7 of the deputy-chief plan provided that, "If the mayor passes over a higher-ranked candidate for a lower-ranked candidate, he must state his reasons for doing so in writing." The female police officers and the black police officers were then given a period of time to challenge the rejection as either sexually or racially discriminatory or retaliatory. Paragraph 7 further provided that, if there is a challenge to a selection, "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge."

In the spring of 1991, after almost another year without activity, Pierce–Hanna complained to the court on behalf of the class of female officers that Mayor Folmar and Chief Wilson were intentionally delaying implementation of the interim plan in order to keep Owens as acting deputy chief. In July 1991, the court entered an order requiring that Folmar and Wilson complete the ranking of the candidates for the position of deputy chief by July 31, 1991. Folmar and Wilson requested, and the court approved, a plan authorizing the Police Department to have the rankings done under the auspices of a private organization.

In early August 1991, the private organization hired by the department completed its rankings, with Pierce–Hanna ranked first and Owens ranked second. Chief Wilson, however, passed over Pierce–Hanna and recommended that Owens receive the appointment. Folmar agreed with Wilson and approved the recommendation.

As expected, Pierce–Hanna quickly responded to the reappointment by filing a challenge on August 23, 1991, charging that Mayor Folmar and Chief Wilson had passed over her and selected Owens because of her sex and because of her participation in this litigation. Pierce–Hanna also requested that the court immediately require that Folmar and Wilson vacate the appointment of Owens pending resolution of her challenge to the appointment. Folmar and Wilson refused to vacate the appointment voluntarily, arguing that the selection plan did not apply to the reappointment. On October 3, 1991, the court entered a final order requiring that the defendants vacate the appointment pursuant to ¶ 7 of the selection plan. *United States v. City of Montgomery*, 775 F.Supp. 1450 (M.D.Ala.1991). The court found the defendants' argument—that the selection plan did not apply to the reappointment—to be "disingenuous." *Id.* at 1455.

By order entered in March 1992, the court found the evidence to be overwhelming that Pierce–Hanna had again been a victim of retaliation. *United States v. City of Montgomery*, 788 F.Supp. 1563

(M.D.Ala.1992). The court repeated its earlier finding that Wilson had rejected Pierce–Hanna in 1989 because he "wanted someone unconnected with this litigation, someone who had not become controversial through his or her support for, or opposition to, these cases," *United States v. City of Montgomery*, civil action nos. 3739–N and 75–19–N at p. 6 (M.D.Ala. June 21, 1989)—in other words, "someone for deputy chief who had not in the past participated in lawsuits challenging the employment practices of the police department," *United States v. the City of Montgomery*, 744 F.Supp. at 1080–81. The court then found that Wilson's recent testimony reflected that he still harbored this bias against Pierce–Hanna. The court concluded that "Wilson intentionally rejected Pierce–Hanna because of his disappointment that she has continued to pursue her litigation," and the court ordered the defendants to appoint her immediately as the new deputy chief. *United States v. City of Montgomery*, 788 F.Supp. 1563, 1574 (M.D.Ala.1992).

#### 4. T. Alford

In early 1990, in response to a challenge filed by Tommi Lee Alford, a female officer in the Police Department, the court held that Chief Wilson had refused to promote Alford to the rank of captain "because of her prominent role in this litigation." *United States v. City of Montgomery*, 755 F.Supp. 1522, 1531 (M.D.Ala.1990). Part of the evidence consisted of comments Folmar made during a radio talk show, condemning the participation of Alford and her husband, then-Colonel Alford, in litigation against the city:

"I'm not the least bit happy about the lawsuits that either one of them have participated in both ex-Colonel Alford and his wife. They both been prominent in lawsuits against the city and ah, I just ... I don't have much use for either one of 'em"

*Id.* at 1530. The court required the defendants to promote Alford. *Id.* at 1531. The

defendants appealed and the Eleventh Circuit affirmed the court's decision. *United States v. City of Montgomery*, 934 F.2d 1265 (11th Cir.1991) (table).

#### 5. Caffey, Pierce, Brown, McDonald, Childrey, and Oliver

More recently, in July 1991, in response to another claim filed by Pierce–Hanna on behalf of other members of the female class—Lois Caffey, Mable Pierce, Jimmetta Brown, Margie McDonald, Nadine Childrey, and Eula Oliver—the court held that the defendants had, in bad faith, refused to comply with two aspects of a 1988 consent decree. *United States v. City of Montgomery*, 770 F.Supp. 1523 (M.D.Ala.1991). First, the decree required the defendants to promote one female to lieutenant and another female to captain in 1990. *Jordan v. Wilson*, civil action no. 75–19–N at p. 5 (M.D.Ala. March 17, 1988). The defendants argued that, although the consent decree required that they make the promotions, they had no obligations to do so because no plan for promotions had been developed and the consent decree did not expressly require that they develop a plan. The court rejected the defendants' argument as "frivolous and disingenuous." *United States v. City of Montgomery*, 770 F.Supp. at 1526.

Second, the 1988 consent decree required that the defendants promote two other named female officers to the rank of sergeant in 1990. The defendants argued that they had not promoted the two officers because of their substandard performance. *United States v. City of Montgomery*, 770 F.Supp. at 1527. In rejecting the defendants' argument, the court relied on an earlier opinion in which the court had specifically instructed the defendants as to when and under what circumstances they may decline to promote an officer in the face of an order or consent decree that required that they do so.[6] The court wrote that it had previously instructed the defen-

---

**6.** In the earlier opinion, the court rejected a female officer's challenge to the defendants' refusal to rescind her demotion and to promote her. The court found that, although the defen-

dants had failed to comply with the express provisions of a court order, relief would be denied to the female officer. *Jordan v. Wilson*, 755 F.Supp. 993 (M.D.Ala.1990).

dants that "In the future ... the defendants must seek formal court approval before taking any action which conflicts with any of the orders of the court." *Id.* at 1528 (emphasis deleted), *quoting Jordan v. Wilson,* 755 F.Supp. 993, 1001 n. 13 (M.D.Ala.1990). In "flagrant disregard of this language and of their obligation under the 1988 consent decree," the court continued, "the defendants refused to promote [the two officers] in 1990 without obtaining prior approval of the court." *United States v. City of Montgomery,* 770 F.Supp. at 1528. "The defendants have not attempted to justify, or even explain, their actions," the court stated, but rather they "have approached this litigation as if the above cautionary instructions by the court did not exist." *Id.* The court characterized "the defendants' actions toward the required 1990 promotions [as being] part of a pattern of conscious disregard and violation of the orders of this court." *Id.* The defendants did not appeal.

### 6. The Letter

The evidence reflected that Wilson continues to prominently and officially signal his feelings about Pierce–Hanna and her lawsuit by displaying to the public on the walls of his office a framed copy of a public letter signed by female officers opposing the prosecution of Pierce–Hanna's initial sex discrimination lawsuit against the department. As the court has explained before regarding this letter,

> "The message to all in the department who see the display or who hear about the display, is clear: that these female police officers whose names are listed in the advertisement are the 'loyal favored,' at least among the women in the department and, correlatively, that those female officers whose names are not listed are not among the favored."

*Jordan v. Wilson,* 667 F.Supp. at 778. Indeed, the evidence from earlier proceedings reflected that one of the department's deputy chiefs stated matter-of-factly at a staff meeting that a certain female officer would never be promoted because she had failed to sign this letter. The deputy chief later testified that it was the common feeling of members of the department that anyone who did not sign the letter would be viewed as "throwing stones," and as "not being in your corner." *United States v. City of Montgomery,* 744 F.Supp. at 1082.

### 7. Lisenby

This same deputy chief also threatened Officer Irma Lisenby just before she was to give testimony in these suits against the department, accusing her of having "jumped ship" and of being "no longer loyal to the police department or the administration." *United States v. City of Montgomery,* 744 F.Supp. at 1082. The deputy chief warned her that she and her division would no longer enjoy the "favorable treatment" they had received in the past. *Id.* Moreover, when Chief Wilson learned of the threat, he took no action against the deputy chief. And in a similar vein, Mayor Folmar has expressed deep disappointment with Lisenby's testimony in these two cases. He stated that she "led the charge for me against the sex discrimination [lawsuit]," but that, in light of her recent testimony in these cases, he no longer viewed her as loyal. *Id.*

### B. Eiland v. City of Montgomery

In 1984, Stephen Eiland, an officer in the Montgomery Police Department, brought a lawsuit against Mayor Folmar and the City of Montgomery charging Folmar had demoted him from the position of corporal to mere police officer because he had a written a humorous poem critical of Folmar and his "body guards." The trial court found in favor of Folmar and the city after a jury trial. The Eleventh Circuit Court of Appeals reversed and directed that a verdict be entered in favor of Eiland. The appellate court found that Folmar had demoted Eiland in violation of the first amendment. *Eiland v. City of Montgomery,* 797 F.2d 953 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

### II. DISCUSSION OF INDIVIDUAL CLAIMS

With the above cases in mind, the court now turns the plaintiffs' individual claims.

The plaintiffs have identified 20 persons who they contend have been victims of retaliation. First, they have identified 15 officers, including themselves, who have presented their claims in support of the plaintiffs' pattern-and-practice class claim and who seek immediate resolution of those claims by the court today. These officers are Green, Hankins, Lonnie Benjamin, Ed Alford, James Bates, Steve Brantley, Randall Brown, Clarence Burson, James Gamble, Ken Hitson, Jere Knox, Irma Lisenby, Frank Mitchell, William Moore, and Robert Ward.[7] And second, as additional background evidence as well as in support of their pattern-and-practice class claim, they have identified five other persons— Larry Benefield, Don Bird, Robert Hankins, Mike Henderson, and Mark Pierce— who testified before the court that they were victims of retaliation but who do not seek relief in this litigation at this time.

### A. The Applicable Law

In considering the claims of these persons, the first issue for the court is what law to apply. The applicable first-amendment law varies depending on the nature of the claim presented. Here, the plaintiffs assert claims based on rights to expression, association, and participation in litigation.

#### 1. Expression

■ The United States Supreme Court "long ago rejected Justice Holmes' approach to the free speech rights of public employees, that '[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a police-

man.'" *Rankin v. McPherson*, 483 U.S. 378, 395, 107 S.Ct. 2891, 2902, 97 L.Ed.2d 315 (1987) (Scalia, J., dissenting), *quoting McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 29 N.E. 517 (1892). Even where a public employee has no independent constitutional right to retain his position, to be promoted, or to receive any other job benefit, the law is clear that a government employer may not deprive him of such a benefit in retaliation for expression protected under the first amendment.[8] *Rankin*, 483 U.S. at 383, 107 S.Ct. at 2896; *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1505 (11th Cir.1990). Judicial scrutiny of a claim by a public employee that he was punished for exercising his right to freedom of speech involves a four-step analysis. *See Williams v. Roberts*, 904 F.2d 634, 637 (11th Cir.1990). *See also Hatcher v. Board of Pub. Educ. & Orphanage*, 809 F.2d 1546, 1556 n. 19 (11th Cir.1987).

■ First, the employee must demonstrate that the expression addresses a matter of "public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Schneider v. Indian River Community College Found., Inc.*, 875 F.2d 1537, 1542 (11th Cir.1989). Whether an employee's expression may be characterized as on a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Rankin*, 483 U.S. at 384–85, 107 S.Ct. at 1987, *quoting Connick*, 461 U.S. at 147–48,

---

**7.** Pierce–Hanna and Tommi Lee Alford were also class claimants in this litigation. However, because they were able to obtain full relief in other litigation, their class claims in this lawsuit are now moot. *See United States v. City of Montgomery*, 788 F.Supp. 1563, 1574 (M.D.Ala. 1992) (court ordered that Wilson appoint Pierce–Hanna as deputy chief, because Wilson had refused to do so in retaliation for her litigation); *United States v. City of Montgomery*, 755 F.Supp. 1522, 1531 (M.D.Ala.1990) (court required Folmar and Wilson to promote Alford to rank of captain because they had refused to do so in retaliation for her participation in litigation against them).

**8.** Although most of the previous cases in this area concern public employees who were *dis-*

*missed* on the basis of their speech, the first amendment right to be free from such retaliation extends to promotions, transfers, and other job decisions by employers. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, —— & n. 8, 110 S.Ct. 2729, 2737–38 & n. 8, 111 L.Ed.2d 52 (1990) ("the First Amendment ... already protects state employees not only from patronage dismissals but even an action of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights") (quotation omitted). *See also Waters v. Chaffin*, 684 F.2d 833, 837 n. 9 (11th Cir.1982). *Cf. Georgia Ass'n of Educators v. Gwinnett County Sch. Dist.*, 856 F.2d 142, 145 (11th Cir.1988).

103 S.Ct. at 1690.[9] Although not "all matters which transpire within a government office" or even "every criticism directed at a public official" will constitute a comment on a "matter of public concern," it is clear that this phrase embraces a wide variety of speech directed to political, social, economic, and cultural issues of substantial, legitimate interest to the public.[10] *See Maples v. Martin,* 858 F.2d 1546, 1552–53 (11th Cir.1988). When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, such expression is not "totally beyond the protection of the First Amendment"; however, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Rankin,* 483 U.S. at 385 n. 7, 107 S.Ct. at 2897 n. 7, *quoting Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. *See also Ferrara v. Mills,* 781 F.2d 1508, 1512 n. 4 (11th Cir.1986).

■ Second, once a court concludes that speech for which a public employee claims he suffered reprisal addresses a matter of public concern, it must resolve the factual issue of whether the expression was a "substantial or motivating factor" in the employment decision. *Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Schneider,* 875 F.2d at 1542. As with the element of "public concern," the employee bears the burden of persuasion on this issue of causation. *Mount Healthy,* 429

U.S. at 287, 97 S.Ct. at 576; *Schneider,* 875 F.2d at 1542. As the Supreme Court has recognized, "Proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood,* 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985). Determining whether a retaliatory purpose was a substantial or motivating factor behind an employment decision thus "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

■ If an employee is successful in showing that his speech directly related to a matter of public concern and that it was the cause of some action adverse to his employment, a reviewing court must next engage in the balancing test first set out in *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in order to determine whether the employer's action was nevertheless justified. Under *Rankin,* "The State bears a burden of justifying the discharge on legitimate grounds." 483 U.S. at 388, 107 S.Ct. at 2899; *see also Connick,* 461 U.S. at 150–51, 103 S.Ct. at 1691–92. The court must decide on a case-by-case basis whether the detrimental impact, if any, of the expression on "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35.[11]

9. An employee who arranges to "communicate privately ... rather than to spread his views before the public" does not forfeit the first-amendment protection that would otherwise be afforded such expression, if addressed to a matter of public concern. *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). *Accord Berdin v. Duggan,* 701 F.2d 909, 912 (11th Cir.), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983).

10. The Supreme Court further explained that: "The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery.

The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.... Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."
*Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 (quotations omitted),

11. Such a balancing standard "reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitu-

*Accord Connick,* 461 U.S. at 150–51, 103 S.Ct. at 1692; *Eiland v. City of Montgomery,* 797 F.2d 953, 955–56 & n. 2 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). In performing such a balancing, the court must not consider the statements in a vacuum; "the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. *See also Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979). Relevant considerations include whether and to what extent the speech in question threatened to disrupt the workplace, impair discipline by superiors or harmony among co-workers, or interfere with the speaker's duties or the regular operation of the enterprise. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. *See also Maples,* 858 F.2d at 1553–54.[12]

■ Fourth and finally, even if an employee has prevailed at each of these three steps, an employer may still avoid liability by demonstrating that it would have reached the same adverse decision with respect to the employee's job even in the absence of the protected speech.[13] *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Schneider,* 875 F.2d at 1542. *See also Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (plurality).

### 2. Association

■ The first amendment guarantees the freedom of individuals to associate both for the purely private purpose of forming and preserving personal and social relationships, and as a collective means of engaging in political expression, religious worship, or other activities independently protected by the Constitution. *Roberts v.*

*United States Jaycees,* 468 U.S. 609, 618–623, 104 S.Ct. 3244, 3249–52, 82 L.Ed.2d 462 (1984); *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984). The law in this circuit, as expressed in *Hatcher v. Board of Public Education and Orphanage,* 809 F.2d 1546 (11th Cir.1987), makes clear that a public employee is shielded from retaliation by his employer on the basis of the employee's associational activity whether or not such activity relates to a matter of public concern. *Id.* at 1558. *Accord Schneider v. Indian River Community College Found.,* 875 F.2d 1537, 1543 n. 6 (11th Cir.1989). Thus in reviewing such a challenge, a court need only employ three of the four steps used in analyzing a retaliation-for-speech claim. The employee must first demonstrate that his associational activity was a substantial or motivating factor in some action adverse to his employment. *Hatcher,* 809 F.2d at 1558. If he carries this burden, the employer may avoid liability only by proving either that he would have reached the same decision even in the absence of the employee's associational activities, or that the government's interest as an employer in the efficient operation of the work place supports the challenged action. *Id.* at 1559.

Although certain first-amendment activities may appear to partake of elements of both expression and association, a court must look to the manner in which the employee's views "became known to the outside world," in order to "determine what line of cases is most analogous to" the employee's retaliation claim. *Berry v. Bailey,* 726 F.2d 670, 673 n. 4 (11th Cir. 1984). Where the employee's beliefs are "made known only through speech and accompanying action—not through those with whom he associated ... or refused to

tional matter." *Connick,* 461 U.S. at 143, 103 S.Ct. at 1688.

**12.** Courts should give particular weight to the heightened need for discipline, confidentiality, esprit de corps, and close working relationships in quasi-military organizations like police departments. *Busby v. City of Orlando,* 931 F.2d 764, 774 (11th Cir.1991). Nevertheless, this may not be taken so far as to require police officers

to "suffer a 'watered-down version' of their constitutional rights." *Eiland,* 797 F.2d at 958 (quotation omitted).

**13.** The rationale behind this fourth step is to avoid "plac[ing] an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Mount Healthy,* 429 U.S. at 285, 97 S.Ct. at 575.

associate" his claim should be analyzed as one of retaliation-for-speech. *Id.*

### 3. Participation in Litigation

■■ The right to participate as a party to litigation seeking to remedy an infringement of constitutionally-guaranteed or other legal rights has traditionally been considered an aspect of the freedom to petition the government for a redress of grievances protected by the first amendment. *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). *See also NAACP v. Button,* 371 U.S. 415, 428–30, 83 S.Ct. 328, 335–36, 9 L.Ed.2d 405 (1963). Similarly, the right to appear and give true testimony as a witness in a legal proceeding is guaranteed by the first amendment's free speech clause. *Melton v. City of Oklahoma City,* 879 F.2d 706, 714 (10th Cir.1989), on reh'g en banc, 928 F.2d 920 (10th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). *Reeves v. Claiborne County Bd. of Educ.,* 828 F.2d 1096, 1100 (5th Cir.1987). *See also Patteson v. Johnson,* 721 F.2d 228, 231 (8th Cir.1983). Thus, as with expression and association, the first amendment protects a public employee from employer retaliation for participating in a legal proceeding, either as a party or a witness.[14] *Melton,* 879 F.2d at 714; *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir.1989); *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1577 (5th Cir.1989);[15] *Patteson,* 721 F.2d at 231.

■■ In order to make out a prima-facie case of retaliation-for-litigation, a public employee must of course establish that his participation in legal proceedings was a substantial or motivating factor in a decision adverse to his employment. *See, e.g., Soranno's,* 874 F.2d at 1314. However, the law is somewhat unclear as to whether the employee must also show that the proceedings or his participation related to a matter of public concern, *compare Arvinger v. Mayor and City Council of Baltimore,* 862 F.2d 75, 76–77 (4th Cir.1988) *with Johnston,* 869 F.2d at 1578, or whether an employer is ever legally permitted—or as a practical matter, factually capable—of demonstrating a threat of disruption to the workplace posed by the employee's litigation or testimony sufficient to justify punishing the employee for such activity. *See Melton,* 879 F.2d at 714; *Curl v. Reavis,* 740 F.2d 1323, 1329 n. 5 (4th Cir.1984). *See also Abbott v. Thetford,* 534 F.2d 1101 (5th Cir.1976) (en banc), *adopting panel dissent,* 529 F.2d 695, 701–709 (1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). However, the court need not resolve either issue; as the court discusses further in evaluating each individual claim, all of the officers whom the plaintiffs allege were retaliated against by Folmar or Wilson for testifying or participating in litigation against these defendants were clearly addressing issues of public concern. Furthermore, defendants have not attempted to justify punishing such officers for these first-amendment activities on the basis of any interference allegedly caused by such testimony or litigation to the efficient operation of the police department; even if they had, the interests of plaintiffs in such exercise of their constitutional rights—at least as to those claims that otherwise have merit—overwhelmingly outweigh any resulting

---

**14.** In the case of administrative or court proceedings related to employment discrimination under Title VII, the act itself forbids employer retaliation. 42 U.S.C.A. § 2000e–3. Although arguably relevant to several of the individual claims of retaliation-for-litigation in this suit, plaintiffs have not relied on § 2000e–3. Accordingly, the court does not address this provision.

**15.** As the Fifth Circuit has commented:
"We would compromise the integrity of the judicial process if we tolerated state retaliation for testimony that is damaging to the state. If employers were free to retaliate against employees who provided truthful, but damaging testimony about their employers, they would force the employees to make a difficult choice. Employees either could testify truthfully and lose their jobs or could lie to the tribunal and protect their job security. Those able to risk job security would suffer state-sponsored retaliation for speaking the truth before a body entrusted with the task of discovering the truth. Those unwilling or unable to risk unemployment would scuttle our efforts to arrive at the truth."
*Johnston,* 869 F.2d at 1578 (citation omitted).

disruption or impairment of the police enterprise.[16] *See Melton*, 879 F.2d at 714. Rather, the disputed and dispositive issue with respect to all the retaliation-for-litigation claims, as well as the vast majority of those claims involving expression and association, is whether the officer in question suffered a job detriment or was denied a job benefit *because of* his exercise of a first amendment freedom, or instead for some other reason.

## B. Application of the Law to 15 Plaintiff Class Members

The court now applies the standards for judging these three types of first-amendment retaliation challenges to the claims brought by the 15 class members seeking immediate relief in this litigation. In each instance, as shown above, one of the critical issues is intent. The Supreme Court in *Arlington Heights* enumerated a variety of possible evidentiary sources of circumstantial evidence of intent, including "[t]he historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up [to] the challenged decision"; "[d]epartures from the normal procedural sequence"; "substantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and "contemporary statements by members of the decisionmaking body." 429 U.S. at 267–68, 97 S.Ct. at 564–65. Other "types of circumstantial evidence commonly encountered which can support an inference that retaliatory motive played some part in the adverse treatment of the employee" include: "[e]vidence that after learning of the opposition, the employer treated the employee differently from similarly situated nonprotesting employees"; evidence that "the employer deviat[ed] from its own written procedures to carry out adverse action against the protesting employee"; "[e]vidence that after learning of the opposition, the employer treated the employee differently than before the protected activity, including evidence that the employer began surveillance ... suggest[ing] the possibility of a search for a pretextual basis for discipline"; "[c]loseness in time between the employer's knowledge of the protected opposition or participation and the adverse activity"; and "[a]ttempts to conceal the fact that the person who decided on the adverse action knew at the time that the employee had engaged in protected participation or opposition." B. Schlei & P. Grossman, Employment Discrimination Law, at 558–59 (2d ed. Supp.1989).

### 1. Green

Green has been an officer in the Police Department for close to 18 years. He currently holds the rank of major and serves as commander of the traffic division. Green makes essentially three claims. First, he claims that Folmar delayed his promotion to captain until June 1985 in retaliation for his vocal opposition during the early 1980's, and particularly 1983, to the department's promotion system, and his lack of support for Folmar's 1983 mayoral campaign; he contends he should have received such a promotion as early as November 1983. Second, Green claims that he was passed over for pro-

---

**16.** The at best one-sidedness of the *Pickering* balance as to each individual claim also dooms defendants' qualified immunity argument. The court believes that defendants have actually abandoned this defense, by doing no more than simply averring it in one line of their answer to plaintiffs' complaint, and presenting no argument whosoever in support of it. However, even if defendants have adequately presented this issue, the court concludes that the prohibition of government retaliation against a public employee for exercising his first amendment rights was sufficiently clearly established at the time of the events in this case, and any interest of the city or the department in squelching such activities either non-existent or sufficiently insubstantial, that neither Folmar nor Wilson could reasonably have believed lawful any of the adverse employment actions against plaintiffs for which the court finds them liable. *See Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1505–06 (11th Cir.1990). *Compare Busby v. City of Orlando*, 931 F.2d 764 (11th Cir.1991); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321 (11th Cir.1989). Moreover, the plaintiffs are not seeking damages from the defendants.

motion to major in June 1988 because he expressed objections to Wilson about impending "emergency" promotions planned by Folmar and because of his August 1987 deposition testimony in *Eiland v. City of Montgomery*, civil action no. 84–T–120–N.[17] Green was later promoted to major in February 1989 after he and Hankins had filed this lawsuit. Finally, according to Green, his January 1991 application for a transfer to the position of commander of the department's detective division was denied as a result of defendants' distaste for his first-amendment activities. The court concludes that only his claim with respect to his promotion to major has merit.

Since joining the department, Green has been an active member and sometimes-officer of the Montgomery chapter of the Fraternal Order of Police, a professional organization of persons employed in law enforcement. One of its principal activities is addressing issues of concern to Montgomery police officers involving the operation of the department or the conditions of their employment, and communicating to Folmar and Wilson the views and positions of its membership.[18] In 1980, Green began to make known at Fraternal Order meetings his opposition to what he believed was an inequitable system of promotions in the department. In 1983, he along with several other members took the lead in initiating efforts to retain an attorney from the National Fraternal Order to assist the local chapter in obtaining changes in the department's promotion process. During an October 3rd meeting that year, he also spoke out at a Fraternal Order meeting against the practice of officers circulating petitions in support of Folmar's candidacy at police stations, and against a proposal that the

Fraternal Order endorse Folmar's reelection.

On several occasions, Folmar indicated displeasure with Green's involvement in the Fraternal Order.[19] In late 1980, Folmar summoned Green to his office. During this meeting, Folmar informed him that he might consider transferring him to the detective division—viewed by most as the most prestigious in the department—and that Green, then a sergeant, was "in reach" of a promotion to lieutenant. However, Folmar warned Green that he would have to choose between pursuing his activities in the Fraternal Order and successfully rising through the department. On October 20, 1983—less than three weeks after the meeting in which Green objected to police and Fraternal Order support for Folmar's mayoral candidacy—Folmar gave an angry, impromptu speech to a large group of officers at police headquarters. In sharp, vituperative terms, he criticized those officers who had been "causing ... trouble," and spoke particularly unfavorably of the Fraternal Order, warning, "[y]ou bring all the damn lawyers you want to down here, we're not going to have collective bargaining, we're not going to have a labor union ... we're not going to have any of that stuff." While uttering these words, Folmar was staring directly at Green. Later, during encounters with Green in 1988, both Folmar and Wilson told him that he was a "troublemaker," referring to his involvement in the Fraternal Order.

Several weeks after Folmar's speech, in November 1983, he promoted three lieutenants to the rank of captain, passing over Green. Pursuant to the promotion process then in effect, he selected these three

**17.** Wilson had not yet become chief of police and thus played no role in Green's non-promotion to captain in 1983.

**18.** There was ample evidence at trial that Wilson and Folmar are made aware by other officers of most if not all of what is discussed at Fraternal Order meetings. There was also evidence that both men are careful to maintain an intimate familiarity with even the most minor, trivial goings-on in the department.

**19.** Defendants took pains at trial to demonstrate that certain officers who were members of the Fraternal Order were favored by Folmar and Wilson. However, the evidence showed that while Folmar and Wilson did not disapprove of membership in the organization per se—indeed, many officers were essentially passive members who treated the Fraternal Order more as a social organization that a tool for collective action—they were hostile towards those officers who played a vocal, active role in the political and advocacy activities of the local chapter.

names from a March 1983 eligibility list submitted to him by the Personnel Board, setting forth the highest-rated officers. Green was the second-highest rated candidate on this list. All three of the officers promoted ahead of Green had received ratings inferior to his.[20]

The court believes that Green has offered proof from which the court may infer that his involvement in the Fraternal Order was a substantial or motivating factor in Folmar's decision not to promote him to captain in November 1983. Yet the difficulty with this claim is that the court has already ruled that all claims in this case arising prior to January 9, 1984, are time-barred under the statute of limitations applicable to § 1983 actions.[21] In response to defendants' limitations objection, Green argues that Folmar continued his retaliation, originally manifested in November 1983, by refusing to promote him between April 1984 and June 1985.[22] However, the court is not persuaded by this theory. After November 1983, no further promotions were made by Folmar from the March 1983 list on which Green was rated number two. In April 1984, a new certification was issued, on which Green was only the eighth-highest rated candidate for captain. In May 1984, Folmar promoted two officers with better ratings than Green to captain, and then in June 1985 awarded Green and two other candidates with similar promotions.[23] Thus as to the May 1984 promotions, Green would most likely not have been selected anyway, as a result of the drop in his rating, even had Folmar not been animated by a retaliatory motive in making these promotions. Furthermore, although Green is correct in noting that

Folmar had the authority, which he sometimes exercised, to make promotions even when no specific vacancy in a rank existed, and thus could have promoted Green to captain at any time, Folmar in fact made no promotions to captain during the period in question other than the two in May 1984 already referred to, and there is no evidence he would have promoted anyone, let alone Green, even absent Green's first-amendment activities. Thus Green's expression and association were not a substantial or motivating cause of Folmar's decision not to promote him in addition to the two other officers selected as captains, between April 1984 and June 1985.

 Green again clashed with Folmar, and this time with Wilson as well, in April 1988. He and several other officers had learned that Folmar and Wilson intended to make certain "emergency" promotions in the Department which both believed would be permitted under an injunction temporarily barring permanent promotions imposed by this court in its 1986 decision in *Jordan v. Wilson*. Green, who took the lead in these events, and several other concerned colleagues met with Wilson to inquire about the emergency promotions and in particular to express dismay at the prospect that these promotions would be awarded to a few hand-picked officers favored by Folmar rather than based on any consideration of merit. It was during this encounter that Wilson called Green a "troublemaker" and referred to his activities in the Fraternal Order.[24] The next day, however, when Green and Wilson again met, Wilson informed Green that he had communicated to Folmar the various objections to the emer-

**20.** The three officers selected by Folmar were rated third, fifth, and sixth on the list.

**21.** *See* Order dated March 4, 1991.

**22.** It is unclear why Green chooses April 1984 as a benchmark date rather than the beginning of the limitations period, January 9, 1984. The court also notes that Green has *not* argued that the court should consider his claim concerning his non-promotion in November 1983 as timely, because it was sufficiently connected to events during the limitations period as to render Folmar's failure to promote Green from November

1983 until June 1985 a "continuing violation." *See Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793, 800 (11th Cir.1988); *Clark v. Olinkraft,* 556 F.2d 1219, 1222 (5th Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978).

**23.** The May 1984 promotions went to the top- and fifth-rated candidates.

**24.** Later, in July 1990, Wilson stated that he did not agree with Green's "political views," during a third officer's disciplinary hearing at which Green was present.

gency promotions, and that Folmar had decided not to follow through on these promotions. Wilson also told Green that Folmar would be angry at Green and these other officers for interfering with his plans.[25]

Prior to this dispute over promotions, Green had also exercised his first-amendment rights in a manner unfavorable to Folmar by giving testimony in several proceedings in an employment discrimination case brought by a fellow officer against the City. In *Eiland v. City of Montgomery*, Green testified in a trial that a poem written by officer Eiland—which lampooned Folmar and his policies and for which he was demoted—did not disrupt the operations of the department. Later, in August 1987, Green testified at a deposition in the same suit after remand from the Eleventh Circuit, this time as part of a proceeding by Eiland contesting his discharge, that he did not believe Eiland's actions in firing a warning shot merited his dismissal, and that the manner in which Eiland's infraction was investigated and he was disciplined was improper and not in accordance with standard procedures. Shortly after this testimony, Folmar attempted to transfer Green from his then-present assignment to a less desirable division, but relented when Wilson refused to go along with this decision.

In June 1988, two months after Green complained to Wilson about Folmar's emergency promotions and less than one year after his deposition testimony in *Eiland*, Folmar promoted five officers to the rank of major. Although Green was the highest-rated candidate on the list from which Folmar made his selections, the mayor passed over Green in favor of five other captains with inferior ratings.[26] Because these promotions were made under the interim plan approved by the court in May 1987, Folmar was obligated to explain to the Personnel Board, in writing, his reasons for making promotions other than in the order of each candidate's rating. As to both Green and another officer passed over for promotion, Folmar wrote: "it is my opinion they need more time to develop their knowledge of leadership skills before being given a Division command." [27] In discussing Green and his promotion decision, Folmar later told Wilson that he did not think Green was someone who would carry out his "philosophical beliefs."

The numerous examples of Folmar's hostility toward Green's first-amendment activities, which the court has discussed, together with the utter absence of any indication that Green suffered from any lack of leadership convinces the court that Folmar refused to promote Green to major in June 1988 in retaliation for such activities—and, in particular, for his testimony in the *Eiland* case.[28] But for this testimony, Green would have been promoted in 1988. This conclusion is supported by not only Folmar's treatment of Green and his dislike for Eiland himself, *see Eiland*, 797 F.2d at 955, but also the extensive evidence, discussed at various points in this opinion, of his animus toward and numerous acts of retaliation against other officers who have

25. Folmar also testified that he asked Wilson for the names of those who objected to the emergency promotions, and that he was aware that Green was one of the most prominent of those who had voiced strong opposition to the plan.

26. The officers chosen by Folmar were rated second, third, fourth, fifth, and eighth. The eighth-ranked candidate is black; Green and the four other officers promoted to major are white.

27. After Green was not promoted, he attempted to discover from Wilson the reason why he was passed over. Wilson indicated the decision not to promote Green involved some problem between Green and Folmar, suggesting Green speak with the mayor if he desired any more information. When Green subsequently met

with Folmar, the mayor expressed anger with Green for questioning his promotion decisions, and called Green a "troublemaker."

28. All of the proof at trial suggested that Green was an exemplary officer and candidate for major, both in terms of leadership and other relevant qualities. Even Wilson testified that he had told Folmar that Green deserved to be promoted to major prior to Green's non-selection in June 1988. There was not a shred of evidence that Green's leadership skills required further development, other than Folmar's own opinion, for which he failed to offer any factual support when questioned about it during his trial testimony.

brought or testified in employment discrimination lawsuits against Folmar and the city.[29] The court thus concludes that Green's major-promotion claim has merit.[30]

■ Green's final claim is that Wilson's refusal to assign him command of the department's detective division, as he requested in writing in January 1991, was retribution for his previously described first-amendment activities and also particularly for his initiation of this lawsuit.[31] The court rejects this claim, finding instead that the decision was based on a professional judgment that appointing a captain with extensive experience in the detective division as its temporary commander would be less disruptive in the long run than transferring Green, and thus being compelled to find a new commander for the traffic division. Whatever the wisdom of this judgment, it does not appear to have been based on Green's exercise of his first-amendment freedoms.

The court will therefore award relief to Green with regard to his 1988–promotion claim only.

### 2. J. Hankins

■ Jerry Hankins, the second named plaintiff in this lawsuit, has been employed as an officer with the Police Department for approximately 17 years, and currently holds the rank of captain and works as the assistant commander of the juvenile division. Like Green, Hankins claims that, despite being the top-rated candidate, he was passed over for promotion to captain in 1988 because he had recently expressed opposition to Folmar's emergency promotion plan.[32] Also contributing to Fol-

**29.** Although the court does not conclude that Green's criticism of the promotion process through 1983 and his renewed objections to emergency promotions in 1988 as inequitable and not properly based on merit were the bases for Folmar's decision not promote him in 1988, the court would nonetheless add the criticism and objections involved issues of favoritism by public officials and the quality of law enforcement that were of obvious concern to the community and could legitimately influence the public's opinion of the department and Folmar, and was not merely tied to a personal employment dispute. *See Eiland v. City of Montgomery,* 797 F.2d at 956 & n. 3 (speech relating to Folmar's "political favoritism" in selecting officers to serve as personal aides "and then in further promoting them in the ranks of the police department" was matter of public concern); *Maples v. Martin,* 858 F.2d 1546, 1552–53 (11th Cir.1988). *See also Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). *Compare Ferrara v. Mills,* 781 F.2d 1508, 1515 (11th Cir.1986). This is particularly true given the context of each of these various criticisms: Green's 1983 opposition to the department's promotion system occurred in the midst of the mayoral campaign, *see Eiland,* 797 F.2d at 956, and his 1988 meeting with Wilson took place at a time in which the race and sex discrimination lawsuits against the Department and thus its promotions policies were prominent topics in the local news. Green's testimony in the *Eiland* employment discrimination case also satisfied the public concern test. *Melton v. City of Oklahoma City,* 879 F.2d 706, 714 (10th Cir.1989), on reh'g en banc, 928 F.2d 920 (10th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). Finally, Green's associational activity with respect to the Fraternal Order was protected from retaliation regardless of whether it touched on matters of public concern.

**30.** The court, however, does not rely on the fact that one or more of the officers whom Folmar promoted to major in June 1988 ahead of Green were his former aides. Plaintiffs have placed great emphasis throughout this case on what the evidence demonstrates they are clearly correct in characterizing as Folmar's "favoritism" towards his aides in promotion and other decisions. However, the court does not agree that Green or any other officer's first amendment rights are violated when the mayor discriminates in favor of one of his former aides, even if the two officers' relative job performances or abilities indicate a contrary decision. This is because the mere fact that an officer has *not* been afforded the opportunity to work as an aide to the mayor does not constitute a form of first amendment activity, be it expressive, associational, or otherwise, for which it can accurately be said the officer has been retaliated against when he loses a promotion or other job benefit to a less qualified former aide.

**31.** Although the determination not to grant Green a transfer was nominally made by Wilson, unlike the refusals to promote Green, the evidence presented at trial overwhelming demonstrated that, notwithstanding Folmar's protestations to the contrary, the mayor still controls most if not all of the significant decisions made in the Department on a day-to-day basis through his frequent contact with and influence over Wilson and other senior officers.

**32.** The five officers promoted to captain under the interim promotion plan in August 1988 were rated second, fourth, fifth, sixth, and seventh.

mar's refusal to promote him in 1988, according to Hankins, was a favorable performance evaluation he gave to another officer, Sandra Pierce–Hanna, at the time Folmar was encouraging retaliation against her for filing a sex discrimination lawsuit.[33] Finally, Hankins contends that after he was finally promoted to captain in March 1989, his participation in this lawsuit resulted in the denial for his request to be reassigned as acting commander of the records and communication division. After closely considering the evidence on these matters, the court finds that none of the first-amendment activities cited by Hankins were, together or separately, a substantial or motivating factor either in his non-promotion in 1988 or the denial of his application for transfer.

Unlike Green, Hankins did not communicate with either Folmar or Wilson about the upcoming emergency promotions during the brief period of controversy over this issue in April 1988. Although Wilson was aware that Hankins opposed such promotions, it is unclear whether his name was ever mentioned to Folmar, and, in contrast to Green, he was certainly not one of the active dissidents.[34] As for Hankins's contention that his non-promotion resulted from a favorable evaluation he gave to Pierce–Hanna, it is true that Folmar expressed displeasure over Pierce–Hanna's positive evaluation or evaluations, telling a group of officers at a 1987 meeting that he would "remember the evaluator." However, it appears that another supervising officer, Grady Arnette, had also given

Pierce–Hanna high marks in a then-recent evaluation, and it is equally plausible, as several officers indeed told Arnette, that Folmar was referring to him rather than Hankins. Finally, although one of the reasons offered by Folmar for passing over Hankins—his need for further experience as an assistant division commander—appears unsupported, as Hankins had spent more time in such a role than the candidates Folmar selected—the court credits Folmar's assertion that he believed Hankins lacked "maturity." Although testimony from fellow officers uniformly demonstrated that Hankins does not in fact lack maturity, but rather simply has a lively and much-appreciated sense of humor, it is convincingly plausible that his occasional jocularity struck Folmar, who has sought to mold the department into a spit-and-polish, military-type enterprise, as inappropriate.[35]

▪ The court similarly credits Wilson's explanation for his refusal to place Hankins in the position of acting commander of the records and communications division. As in Green's case, although Hankins may well be more qualified than the present occupant of that position, the court is persuaded that Wilson's decision was motivated purely by institutional, law enforcement concerns, and not by any retaliatory animus toward Hankins.[36] Hankins is not entitled to any relief.

### 3. Benjamin

▪ In many ways, Lonnie Benjamin has suffered the most shameful, humiliat-

---

33. The trial revealed that it was Folmar who denied Hankins a promotion to captain in 1988 and, indeed, that Wilson recommended to Folmar that Hankins be promoted at that time.

34. Hankins was not on active duty during this time, but was instead attending a two-week "advanced leadership" seminar at Maxwell Air Force Base in Montgomery. He testified that upon hearing rumors of the emergency promotions, he expressed his objections to them to several fellow officers.

35. It is open to question whether Hankins's claim that his non-promotion resulted from a favorable evaluation of Pierce–Hanna is cognizable under the first amendment. It could be argued that his conduct constituted neither first-

amendment protected expression nor association, and, of course, it did not involve participation in litigation. In any event, this court need not reach this difficult issue.

It appears, however, that the claim could be cognizable under Title VII. 42 U.S.C.A. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter"). The plaintiffs have not relied on Title VII in this litigation.

36. The court credits Wilson's testimony that he kept Hankins in the juvenile division because of his abilities as an investigator.

ing manifestation of Folmar's retaliatory bias against those officers who resort to the courts to safeguard their constitutional rights. Benjamin has been employed with the Police Department since 1971, and currently holds the rank of sergeant. In October 1983, two white Montgomery police officers were assaulted and one was shot after a confrontation in the home of an African–American family. Several members of the family were then taken into custody and allegedly brutalized by the police. Benjamin and another officer were assigned to investigate these events, which became a local cause celebre, known as the "Todd Road incident." When Benjamin and his colleague were subpoenaed to testify at the criminal trial of one of the family members, he refused to answer questions about the investigation of the incident, invoking his fifth-amendment right against self incrimination. In response, Folmar, who was also present in the courtroom as a witness, immediately fired both officers. Each man brought suit in this court against Folmar and the City of Montgomery, challenging their dismissals. Although the district court denied relief, the Eleventh Circuit reversed, holding that Folmar had illegally punished the two officers for exercising a fifth-amendment privilege. *See Benjamin v. City of Montgomery*, 785 F.2d 959 (11th Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986).

Following the appeals court's decision, Benjamin returned to work at the Department in 1987 pursuant to a settlement of his lawsuit which called for him to be reinstated as a sergeant with back pay. However, instead of allowing Benjamin to fill a normal position in one of the divisions and permitting him to perform police work, Folmar personally assigned—or more accurately, condemned—him to a nominal, dead-end position at the Montgomery Civic Center, a public auditorium.[37] Prior to Benjamin, no other officer had ever been assigned there full-time. At the civic center, Benjamin has no police duties or job description, no supervisor or fellow officers, has never been substantively evaluated for promotion, never met with a senior officer to discuss his work performance, and is not invited to any police rollcalls or meetings.[38] Benjamin spends most of his on-duty time reading books. In short, as Benjamin himself described his situation which has now lasted approximately four years, it is a cruel "joke."

Not only has Benjamin endured this degrading experience for four years; it has also obviously destroyed any chance of promotion he might have had. Benjamin was promoted to sergeant in 1978. Although his ratings for promotion to lieutenant improved in the early 1980's prior to his discharge, he received a far lower rating than before when he was "evaluated" in 1988 after his return to the Department. Of course, as Benjamin has been prevented from doing anything that even vaguely resembles police work, it is difficult to imagine how anyone could actually judge his performance, and it is obvious he has been prevented from developing the experience, accomplishments, and skills that are considered relevant to whether an officer merits promotion.

In his testimony at trial, Folmar sought to justify his decision to place Benjamin at the civic center as one taken for Benjamin's protection by claiming that a "variety of sources" had informed him Benjamin would be retaliated against by other officers because of his refusal to testify at the trial arising out of the Todd Road incident. However, Folmar—uncharacteristically un-

---

**37.** Immediately upon Benjamin's rejoining the department in 1987 and for one month prior to his banishment to the civic center, he was assigned to the Montgomery Art Museum, purportedly to help develop a security system, although no officer had ever been sent to work at the museum on a full-time basis. As with his "job" at the civic center, this too proved to be an unpleasant, humiliating sinecure. Benjamin again had no job description, no desk, no phone, no access to the museum's galleries, and found he was not needed, as the museum had arranged with an outside party to engineer and install a security system and the job was near completion.

**38.** In 1988, a captain in the department "evaluated" Benjamin for promotion; however, this individual had never even seen or talked with Benjamin prior to rating him.

thorough—made no effort to discover if Benjamin himself desired such protection or was willing to sacrifice his career and suffer humiliation in return for it, or to pursue other means of ensuring that officers would treat Benjamin fairly, as he has done in certain other situations. Nor did the mayor seek to learn whether rumors of hostility toward Benjamin were true, and, if so, which officers planned reprisals. Finally, Folmar's alleged "concern" for Benjamin's welfare and the possibility of retaliation against him flies in the face of Folmar's own record of encouraging reprisals against Sandra Pierce–Hanna and other officers who oppose him through litigation. Upon consideration, the court does not credit Folmar's testimony on this issue, but instead finds that he relegated Benjamin to the civic center purely out of spite evoked by Benjamin's successful employment discrimination suit against the mayor.[39] But for his litigation, Benjamin would have enjoyed a full and active career as an officer *within* the Police Department. Benjamin is entitled to full relief.

### 4. E. Alford

Ed Alford retired from the Police Department in September 1989 at the rank of deputy chief. He claims, first, that, because he had clashed with Folmar over several work-related issues, Folmar failed to select him for the position of chief in 1986 although he was the top-rated candidate, choosing Wilson instead. Alford's second claim is that he was excluded from policy decisions and otherwise ostracized after giving deposition testimony in this case in December 1988. The court concludes that Folmar's refusal to select Alford as chief does not give rise to an actionable claim, but that his first-amendment rights were violated as a result of the retaliatory treatment he suffered in response to his 1988 testimony.

 Alford's first claim fails to meet the threshold, "public concern" test set forth in *Connick* and its progeny.[40] All of his "speech" that gave rise to disagreements between Alford and Folmar prior to the mayor's 1986 selection of Wilson over Alford as the department's new chief— Alford's poor evaluation of one of the mayor's former aides, a directive by Alford involving the type of shoes to be worn by officers which was overridden by Folmar, and Alford's refusal to be more forthcoming in acting as a personal conduit to Folmar for information about day-to-day events in the department—essentially involved personal grievances about matters purely internal to the department, rather than issues of public concern.[41] Moreover, it appears that the job of chief of the

---

**39.** Admittedly, Folmar's trial testimony suggested that he was unrepentant about and indeed even still felt justified in firing Benjamin for the exercise of his constitutional rights and forcing him to run a legal gauntlet to regain his job. Because this reason is illegitimate and because the defendants have not offered it as the true reason behind Folmar's conduct toward Benjamin, the court has some concern as to whether it can consider it as the true reason. Nevertheless, even if evidence of Folmar's bias toward Benjamin because he took the fifth amendment were factored in, the court would reach the same conclusion. In view of Folmar's history of retaliating against litigators, the court is convinced that Benjamin's lawsuit was itself the principal basis for his exile.

**40.** None of Alford's first-amendment activities during this period appears to have been associational ones, with respect to which it is not necessary for an employee to show a relation to matters of public concern in order to prevail.

**41.** It is true that the dispute over Alford's evaluation of Folmar's former aides touched on the issue of Folmar's favoritism and the inequities of the department's promotion system, the same matter of public concern recognized by the Eleventh Circuit in *Eiland v. City of Montgomery*, 797 F.2d 953 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), and by this court with respect to the first-amendment activities of Green and several class members. However, unlike Green and Eiland, Alford did not complain about the department's promotion system or even about any particular decision made by Folmar; he simply gave a certain officer a poor evaluation and refused to change it when the mayor complained. In distinguishing Alford's case for such reasons, the court follows the direction to determine whether particular expression addresses matters of public concern, on a case-by-case basis, and by reference to "the content, form, and context of a given statement, as revealed by the whole record." *Rankin,* 483 U.S. at 385, 107 S.Ct. at 2897, *quoting Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690.

department may be so "confidential" or of a "policy-making" nature that it would entitle Folmar greater latitude to consider even those first-amendment activities of a candidate for chief that involved matters of public concern, in determining whether to promote such a person to this position. *See Branti v. Finkel,* 445 U.S. 507, 517–19, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 367–68, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976); *Terry v. Cook,* 866 F.2d 373, 376–78 (11th Cir.1989).

■ The court reaches a different conclusion as to Alford's contention that Wilson and Folmar excluded him from the normal functions of his job in retaliation for his testimony in this case. Alford's testimony, given on December 20, 1988, was extremely critical of the mayor and his policies. Alford also submitted an affidavit in this lawsuit in support of plaintiffs in January 1989. The affidavit, along with Alford's deposition testimony, were filed by plaintiffs in support of their motion for class certification on January 20, 1989. Several days later, on the last Friday in January, Alford received an unusual telephone call at a hospital where he was visiting his mother, summoning him to Wilson's office. When they met, Wilson asked Alford, who had previously discussed the possibility of soon retiring, exactly when he would be leaving. Alford, sensing Wilson's implicit message that he and Folmar wished for Alford to retire as soon as possible, suggested the fall of that year. Wilson thereupon informed Alford that Roger Owens, a major in the department, had already been selected to replace him, and that Owens would be assigned to Alford's office to begin training for his new position. However, immediately following this meeting, Owens, rather than being trained by Alford, in effect replaced him. With Wilson and Folmar manifesting approval of such an arrangement through their actions toward Owens and Alford, Owens took over Alford's desk as well as all of his

duties. Correspondingly, Wilson and other senior officers froze Alford out of all meetings, policy decisions, and tasks he had ordinarily performed in the past as part of his ordinary job duties. Such a course of events was unheard of in other situations where officers were preparing for retirement. As a result of such treatment, Alford, on Owens's suggestion and Wilson and Folmar's approval, took administrative leave in August and later retired as planned in September 1989.

In addition to the close temporal proximity between Alford's participation in this lawsuit and the initiation of Wilson's efforts to pressure him out of his job, the court also relies on Folmar's own statement in concluding that the treatment Alford suffered in 1989 was motivated by retaliation for his testimony. In a June 1990 radio talk-show broadcast, Folmar lashed out at Alford for his "disloyalty." Noting that Alford has "testified in the Hankins and Green suit ... against me," Folmar complained that Alford had "the same value placed on loyalty as the Judas of Iscariot." Later in the show, referring to Alford and his wife, Tommi Lee Alford, Folmar said that "[t]hey both been prominent in lawsuits against the city and ... I don't have much use for either one of 'em." [42] During a similar radio show two months later, Folmar commented that he should have fired certain officers who had been "involved in some of these lawsuits." Thus there is sufficient evidence from which to infer that the events which culminated in Alford's taking administrative leave and later retiring derived from Folmar's retaliatory animus.

■ However, although Alford's second claim has merit, he is not entitled to any relief on the present record. Because he has now left the department there is no injunctive relief the court could give that would help him, and he has not sought damages. The court will therefore give the parties an opportunity to address the issue

---

**42.** The court also notes that the fact that local citizens often called to ask questions about issues concerning Folmar's relationship the with the department, suits against him by officers,

and other department affairs, supports the court's conclusion that the expressive activities of Green and other class members addressed matters of public concern.

of relief. Unless the plaintiffs can show how Alford is entitled to relief, the court will find in favor of the defendants on his claim.

### 5. Bates

■ James Bates retired in 1988 as a corporal after 20 years with the department. He contends that Folmar transferred him to an undesirable assignment because of his refusal to sign a petition or contribute money in support of Folmar's reelection campaign in October 1983 and because of his visit to the campaign headquarters of Folmar's opponent for mayor. Bates also suggests that Folmar punished him for these activities by subsequently failing to promote him. The court finds that Bates's transfer was retaliatory, but that his failure to obtain a promotion did not result from the events in 1983. Furthermore, although any individual claim for relief Bates might have for the October 1983 transfer is time-barred, the court will consider the incident to the extent it constitutes relevant background evidence with respect to plaintiffs' class claims and other, timely individual claims.

In October 1983, Bates, along with two other officers, Clarence Burson and Charles Brasington, was assigned to the school relations bureau of the juvenile division. He had worked in the division for over ten years, and had been assigned to this particular bureau for approximately two years. On October 6, 1983, while on duty, Bates visited the offices of his lawyer to inquire about a hunting permit. Accompanied by Brasington, a sergeant and the bureau's supervisor, Bates remained there approximately one-half hour. Bates's lawyer at that time was working on behalf of Folmar's opponent in the upcoming election for mayor, and, in fact, the lawyer's office served as the opponent's campaign headquarters.

Later that afternoon, the commander of the division, James Gamble, received an urgent message while attending a court hearing to telephone the mayor. When Gamble did so, Folmar informed him that he had learned that Bates, Brasington, and possibly one other officer from the juvenile division had been seen at his opponent's headquarters, and that Gamble should obtain a statement from them about the purpose of this visit.[43] When Gamble later did so, and informed the mayor that Bates and Brasington had gone to the lawyer's office for a purpose unconnected with the campaign, Folmar told Gamble that the men were lying.

Less than three weeks after this incident, Bates, Brasington, and the third member of the school relations bureau, Burson, were transferred to the patrol division and assigned to the night shift.[44] Such an assignment is considered the least desirable in the department. When Bates complained about the transfer to then-Chief Charles Swindall, Swindall told him that he had been transferred for keeping the "wrong company." When Gamble also objected to the reassignments, asking one of the deputy chiefs why all three members of the bureau were being transferred, thus making it difficult for him to train their replacements, he was also rebuffed.[45] Such

---

**43.** Contrary to the rationale for Folmar's inquiry suggested by defendants, the concern Folmar voiced during his conversation with Gamble centered exclusively on where Bates was, not on whether he was on or off duty at the time. Moreover, the evidence indicates that there did not exist any strictly enforced policy prohibiting officers from running brief personal errands while on duty. Thus defendants have suggested no institutional interest sufficient to outweigh Bates's first amendment right to free association in these circumstances.

Furthermore, defendants' observation that Bates had expressed an interest in transferring to the patrol division misses the mark. First of all, Bates had expressed interest in being as-

signed to the patrol *day* shift. Second, he had done so approximately one or two years prior to October 1983, and the evidence does not indicate his transfer that month was in any way connected with his previous inquiry.

**44.** All three men had worked days in the school relations bureau.

**45.** Prior to the October 1983 incident, Folmar would often greet Bates by name when the two encountered each other. However, after Bates was transferred, Folmar never spoke with him on occasions when the two were in each other's presence.

evidence persuades the court that Folmar arranged the transfers as a reprisal for Bates, Brasington, and—he wrongly believed—Burson's visit to his opponent's campaign headquarters.[46] Such association is clearly an activity protected from retaliation by the first amendment, regardless of its connection to matters of public concern. Nevertheless, as the court has noted, any claim arising from the transfers is not independently actionable because the statute of limitations has already expired.

The court, however, reaches a different conclusion as to Bates's promotion claim. The evidence demonstrates that his ratings were not sufficiently positive, both before and after the October 1983 incident, to place him in contention for a promotion to sergeant.[47] Thus Wilson and Folmar's failure to promote him was not motivated in any way by retaliation. Bates is therefore not entitled himself to any relief in this litigation.

### 6. Brantley

■ Steve Brantley retired from the department as an investigator in 1983. He claims that Folmar ensured that he did not receive a promotion for several years prior to his departure, as a result of a 1977 confrontation between the two. This incident, in which Brantley called the mayor a "liar" in front of several other officers at the Fraternal Order lodge, resulted from Folmar's failure to follow through on a promise made to Brantley, while an officer in the organization, with regard to a police pay raise. The court finds that Brantley's claim is time-barred because it arose prior to the January 9, 1984, limitations date in this case. Moreover, the court is convinced that Brantley was punished not for his speech itself—his belief that Folmar had betrayed him—but rather for his rude manner toward Folmar. The first amendment does not protect rudeness. The expression for which Brantley was allegedly punished also did not address a matter of public concern.

### 7. Brown

■ Sergeant Randall Brown has been employed with the Police Department for 13 years, and now works in the traffic division. Although he became a sergeant in 1981, he has not been promoted to lieutenant, a situation he attributes to his having spurned Folmar's offer to become a personal aide in 1982.[48] Based on the evidence now before it, the court finds otherwise. Prior to his 1982 encounter with Folmar, Brown had not previously been eligible to be rated for promotion to lieutenant. On the next list of lieutenant candidates, issued in March 1983, Brown was not rated well enough to be considered for selection as a lieutenant.[49] Although his ratings have improved in subsequent years, such that he is now the top-rated candidate for the next promotion to lieutenant, all those promoted to lieutenant since then, with the exception of persons promoted under this court's orders in race and sex discrimination suits against the department, have had ratings superior to Brown's. Wilson's and Folmar's actions toward Brown were not in any sense motivated by retaliation. Brown is not entitled to any relief.

---

**46.** The mayor acknowledges that he learned of the visit by Bates and his colleagues to the campaign headquarters of Folmar's opponent, and that he was involved in the decision to transfer them.

**47.** Although there is ample evidence that Folmar in many cases influenced the evaluations given by senior officers to promotion candidates, and thus that the ratings an officer received could conceivably themselves be a product of retaliation, *see Jordan v. Wilson,* 667 F.Supp. at 776, the lack of any significant change in Bates's ratings after October 1983 suggests that this did not occur in his case.

**48.** Brown declined the position, explaining to Folmar that he was content working a day shift in the narcotics bureau and that, because his wife was expecting a child, he did not feel he could put in the especially long hours Folmar demanded of his aides. According to Brown, Folmar's response was to suggest that he would perhaps consider Brown again for such a position on a more auspicious, future occasion.

**49.** The evidence is not convincing that Folmar caused Brown to receive a poor rating.

## 8. Burson

For the reasons described by the court in its discussion of the claim of Bates, the court also finds that Folmar arranged for ·Clarence Burson, a former officer with the Department, to be transferred to an undesirable assignment in retaliation for what the mayor mistakenly believed were Burson's associational activities. However, as is the case with Bates, any individual claim Burson may have arising from this incident is now time barred. Again, the court will consider Folmar's actions with respect to Burson, where appropriate, as relevant background evidence with regard to plaintiffs' class claims and other, timely individual claims. Burson is not entitled to any relief for himself.

## 9. Gamble

▮ James Gamble, a major who currently serves as city jail administrator, has worked for the department for 18 years. As the court has noted, it has already found, as part of the June 1989 ruling in *Jordan v. Wilson,* civil action no. 75–19–N, and *United States v. City of Montgomery,* civil action no. 3739–N, that Wilson refused to consider Gamble along with three other majors in the department for the vacant position of deputy chief, because of their involvement in litigation against the department.[50] Gamble now contends that because of his involvement in that litigation, defendants have again retaliated against him by, first, depriving him of the use of a cellular phone while distributing one to other similarly situated officers; second, handling a confrontation between him and a subordinate officer adversely and in a manner different from that in which similar situations are customarily treated; and, third, criticizing certain aspects of his work and requiring him to make changes in his management of the jail.

50. Gamble has also participated in another aspect of such litigation, in which he argued he was punished for favorably rating Pierce–Hanna. That action against the city was disposed of through a settlement.

51. The court notes, however, that it does not accept defendants' suggestion that Gamble did

·The court is not persuaded by any of these three claims. Gamble has not presented convincing evidence that Wilson's failure to provide him with a cellular phone derives from any retaliatory motive. Several other officers who were as or more active than Gamble in litigation against the department and against whom Folmar and Wilson have also retaliated in the past have received cellular phones. Furthermore, Wilson's statement that almost all of Gamble's on-duty time is spent at the jail, unlike other majors in the department and the handful of lower-ranking officers who have been assigned cellular phones, is not an incredible explanation for his failure to provide Gamble a phone. Finally, other officers have received these phones one-by-one over time, and Gamble is apparently next in line to be assigned a cellular phone. In the meanwhile, he has temporary access to one of the department's cellular phones during those times when he is on-duty outside the jail.[51]

As to Gamble's contentions regarding Wilson's investigation of a dispute between Gamble and an officer under his command, and Wilson's ensuing orders to Gamble to make certain changes in his running of the jail, the court questions whether, as a threshold manner, these incidents actually constitute employment actions tangibly adverse to Gamble, sufficient to constitute a first-amendment violation, even if undertaken for retaliatory reasons. The court voices this concern, while taking account of the Supreme Court's observation in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, ——, 110 S.Ct. 2729, 2737–38 & n. 8, 111 L.Ed.2d 52 (1990), that "the First Amendment ... protects state employees not only from patronage dismissals but even an action of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights" (quotation

not receive a phone because it was not in the police budget. The evidence makes clear that Folmar has the practical authority, which he frequently exercises, to order that certain items or equipment be bought for particular purposes, whether or not money has been allotted in the official budget for such purchases.

omitted).[52] Yet the court need not address such an issue, as it finds that Wilson's actions were not reprisals for Gamble's participation in litigation, but rather were fully and genuinely motivated by legitimate, law enforcement concerns.

In conclusion, none of Wilson's and Folmar's actions toward Gamble was in any manner motivated by retaliation. Gamble is not entitled to any relief.

### 10. Hitson

Ken Hitson retired as a sergeant in 1988 after 20 years of service with the department. He now claims that Folmar passed him over for promotion to sergeant in September 1983 and later refused to promote him to lieutenant in reprisal for his refusal to show support for Folmar's mayoral candidacy that fall.[53] The court, however, is not convinced that Folmar's actions toward Hitson were motivated in any way by retaliation. Folmar promoted Hitson to sergeant two months later, in November 1983. Moreover, Hitson's initial non-promotion claim is time barred, and his subsequent ratings for promotion to lieutenant were never good enough to place him within reach of such a position.[54] Hitson is not entitled to any relief.

### 11. Knox

Knox had worked as an evidence technician in the detective division and held the rank of corporal when he left the department in 1990. He claims that in late 1989 and early 1990 he was denied several opportunities to attend out-of town police training courses in retaliation for his extensive involvement in the Fraternal Order. The proof adduced at trial supports these contentions. Since the early 1980's, Knox has been active in the organization. In 1983, Rickey Mobley, then a lieutenant and Knox's supervisor, warned him that if he wished to succeed in the department, he should avoid the Fraternal Order.[55] In late 1989 and early 1990, when Knox's supervisor, Sergeant R.A. Foster, recommended to Mobley, who by then had become commander of the detective division, that Knox be permitted to attend these training courses, Mobley peremptorily denied the requests. In doing so, he told Foster, on at least one occasion, that if officers wanted to attend meetings at the Fraternal Order lodge, and direct criticism at Wilson, they would not be permitted to attend any training courses.[56] Mobley rebuked Foster for submitting Knox's name, threatening that if he did so again, no officer from Foster's evidence technician bureau would be allowed training.

The court is persuaded that Mobley's strong sense that Wilson and Folmar disapproved of the "agenda" of the Fraternal Order, together with these other facts, is sufficient to raise an inference that his treatment of Knox constituted retaliation either explicitly or implicitly approved by Wilson and Folmar, through these defen-

---

**52.** Gamble and his subordinate's complaints against one another resulted in the other officer's transfer and no action against Gamble; his challenge focuses only on Wilson's failure to discipline the officer, despite Gamble's charge that she had engaged in misconduct. With regard to Wilson's criticism of Gamble's work, this consisted of a directive from the police chief to Gamble, ordering him to make certain changes in his management of the jail relating to the handcuffing of intoxicated persons detained in the jail, the maintaining of records of prescription drugs given to prisoners, and several other practices.

**53.** Hitson testified he refused to sign a petition for Folmar that was circulated among officers, did not raise his hand when a supervisor asked a group of others to indicate who was planning to vote for Folmar, and did not contribute money to the campaign.

**54.** As the court has previously noted, although there is evidence Folmar often influenced the ratings officers received during this period, there is no evidence he did so in Hitson's case, or that Hitson's ratings changed significantly after his failure to support Folmar's reelection.

**55.** Mobley has more recently made similar comments to another young officer, active in the Fraternal Order, warning him that such involvement would incur the wrath of Wilson and Folmar.

**56.** Mobley was and is extremely close to Wilson, both personally and, prior to his recent retirement, professionally. The evidence also shows that they discussed the activities of the Fraternal Order on at least several occasions.

dants' own actions and statements.[57] Furthermore, while the court does not doubt that the factors cited by Mobley—Knox's apparent intention to leave the department for another job and his health problems— may have somehow also influenced his decisions to deny Knox's training requests, the court believes that Knox's significant participation in the Fraternal Order was nevertheless a substantial or motivating factor in these decisions, and that defendants have not shown that Mobley would have taken the same action even absent Knox's active association with the Fraternal Order. Finally, the court also is convinced that the first-amendment activities by Knox which animated Mobley's refusal to allow him training clearly involved both expression on matters of public concern and association.[58]

■ Nevertheless, as with Alford, although Knox's claim has merit, he is not entitled to any relief on the present record. Because he has now left the department there is no injunctive relief the court could give that would help him, and he has not sought damages. The court will therefore give the parties an opportunity to address the issue of relief. Unless the plaintiffs can show how Knox is entitled to relief, the court will find in favor of the defendants on his claim.

**57.** Both Folmar and Wilson have made no secret of their antipathy toward the Fraternal Order's "political" activities, and it is reasonable to infer that Mobley was pursuing what defendants had led him to believe were their "policies."

**58.** At the time Mobley denied Knox training, the Fraternal Order was deeply involved in this lawsuit, which from its inception, has raised issues of wide interest to the community, including the one which appears to have angered Mobley: plaintiffs' request, supported by the Fraternal Order, that the court place the department in receivership because of Wilson's alleged inability to prevent illegal interference by Folmar in the operation of the Department. Wilson himself freely acknowledges his own hostility toward the Fraternal Order and the members who have been in the forefront of the organization's support of this lawsuit. He admits to pressuring Fraternal Order leaders to forswear any official endorsement of the litigation, and also admits to having retaliated against the Fraternal Order because of their refusal to do so, in his recent decision to cease allowing members to receive half-pay for time spent attending out-

### 12. Lisenby

■ As the court has noted, it has already found, in an order entered in June 1989 in *Jordan v. Wilson*, civil action no. 75–19–N, and *United States v. City of Montgomery*, civil action no. 3739–N, that defendants retaliated against Irma Lisenby by failing to consider her and three other majors, who had participated in these lawsuits, for the position of deputy chief. In that opinion, the court also pointed to evidence that Folmar had complained that he felt betrayed by Lisenby because of certain testimony she gave in one proceeding in the race and sex discrimination litigation,[59] and to evidence that a deputy chief had threatened Lisenby just before she was to give testimony in these two suits, accusing her of having "jumped ship" and of being "no longer loyal to the police department or the administration," *United States v. City of Montgomery*, 744 F.Supp. at 1082, and warning her that she and her division would no longer enjoy the "favorable treatment" they had received in the past. *Id.*

The plaintiffs seek to show that Lisenby has since been punished again for this exercise of her first amendment rights. However, the court finds that several challenged actions—a reprimand of Lisenby by Folmar and Wilson for allowing one of her

of-town conferences sponsored by the state or national Fraternal Order. Wilson continues to allow officers attending other similar conferences not directly related to department work— for example, meetings of the Alabama chapter of graduates of the F.B.I. academy—to receive partial or full pay for such time away from their jobs, because they are not part of organizations whose first-amendment activities he dislikes.

Furthermore, as the court has discussed with reference to other individual claims, defendants have not sought to justify retaliation against persons active in the Fraternal Order by reference to any disruption the organization's political activities have caused to the department's functioning, nor is there evidence to support the proposition that such interference has occurred or that it is significant enough to outweigh the rights of the organization's members to exercise their first-amendment freedoms.

**59.** Indeed, Folmar, in his testimony in this case, confirmed that he believed Lisenby was "disloyal" by virtue of her participation in litigation that "undermined" his position.

subordinates to arrange a public forum on gang activity in Montgomery without their approval, and the creation of a special gang unit outside the ambit of the juvenile division—did not result from any retaliatory motivation but rather were legitimate personnel decisions. Furthermore, although the court is troubled by the other claims—that Lisenby's juvenile division has been short-changed by Wilson and Folmar of equipment, and that these defendants have obstructed Lisenby's management of the division—the court is not convinced on the present record that the defendants were motivated by retaliation.[60] Lisenby is not entitled to any relief.

### 13. Mitchell

 Frank Mitchell is a lieutenant in the recruiting division who has worked in the department since 1975. He claims that he was transferred from the juvenile to the detective division in March 1988 as punishment for having given testimony favorable to Eiland in August 1987 following the remand of the *Eiland* case to the trial court by the Eleventh Circuit.[61] Although the court has already noted Folmar's antipathy toward Eiland and Eiland's lawsuit, and has found that the mayor's refusal to promote David Green in 1988 stemmed from Green's testimony on Eiland's behalf, the court cannot reach the same conclusion with respect to Mitchell. It is difficult to construe Mitchell's reassignment as retaliation, because the detective division is, if anything, considered more prestigious and desirable than the juvenile division. Moreover, there is not any other evidence particular to Mitchell which is sufficient to convince the court that Folmar and Wilson were in any way motivated by retaliation toward Mitchell. Mitchell is not entitled to any relief.

### 14. Moore

 William Moore has been employed with the department since 1978, and currently serves as a sergeant in the detective division's property bureau. He contends that his failure to obtain the position of commander of this bureau in February 1991 was attributable to his vocal opposition to Folmar's emergency promotion plan in April 1988.[62] It is true that both Mobley, who in February 1991 was retiring as commander of the detective division, and Captain V.H. Hicks, who was taking his place, recommended that Moore be selected to fill the vacant position of property bureau commander, but that Wilson rejected their suggestion, instead choosing a sergeant with somewhat less experience than Moore. However, on balance, these facts alone are insufficient to convince the court that his non-selection for property bureau commander was motivated in any manner by the emergency promotion controversy which occurred *three years* earlier.

### 15. Ward

 Lieutenant Robert Ward, who has been with the Department 14 years, currently works as an accident investigator in the traffic division. Ward claims that Folmar delayed his promotion to lieutenant until February 1986 and subsequently refused to promote him to captain because he did not support Folmar's 1983 campaign and because of a confrontation among Ward, Folmar, and one of Folmar's aides in Folmar's office in late 1985. He also con-

---

**60.** The court would note, however, that in *Jordan v. Wilson,* civil action no. 75–19–N, and *United States v. City of Montgomery,* civil action no. 3739–N, it will continue to be sensitive to the issue of Folmar's and Wilson's treatment of Lisenby and her division. Indeed, this issue is probably better addressed in that long-standing litigation.

**61.** Although plaintiffs' post-trial brief alludes to a challenge by Mitchell to his non-promotion to captain during the years 1984–1986, there is no evidence that Mitchell engaged in any first-amendment activity during or prior to this period which might have induced Folmar not to promote him.

**62.** The plaintiffs indicated at trial, but did not address in their post-trial brief, that Moore also claimed that he was not promoted to lieutenant because of his 1982 support for George Wallace, Folmar's gubernatorial opponent that year. However, the evidence shows that Moore's ratings throughout the period since that time were not sufficiently positive to place him within reach of promotion, and the plaintiffs have not persuaded the court that Folmar directly or indirectly influenced his evaluations.

tends that his active involvement in this lawsuit, through participation in class meetings and the filing of an individual claim in August 1990, incited defendants to refuse to select him as assistant commander of the detective division in February 1991, and instead to transfer him to a less favorable assignment in the traffic division.

The court cannot sustain Ward's promotion challenges. The evidence concerning his political position towards Folmar's campaigns in 1982 and 1983 is ambivalent—he refused to contribute money or to sign one petition, but did sign another and voted for Folmar—and there is no evidence that any lack of support by Ward influenced Folmar's decisions to pass Ward over for promotion to lieutenant in favor of worse-rated candidates in 1984 and 1985.[63] Indeed, Ward was soon after promoted by Folmar to lieutenant in February 1986. Similarly, Ward's evidence of a confrontation between himself, the mayor, and one of Folmar's aides in the mayor's office in late 1985 also does not establish that any subsequent adverse employment action towards him constituted a first-amendment violation. The meeting occurred when Ward went to inquire as to why he had twice been skipped for promotion. It turned into a dispute when Folmar, and later his aide, told Ward it was because he could not control the officers who worked for him, and Ward responded that the mayor's aide was a "liar." None of this rises to the level of expression by Ward on matters of public concern. Moreover, the fact that Folmar promoted Ward to lieutenant soon after the confrontation suggests that it was subsequently not a significant factor in the mayor's treatment of Ward.

■ The court reaches a similar result with respect to Ward's contention that he was denied the position of assistant commander of the detective division and transferred to the traffic division because of his decision to become a part of this lawsuit. The evidence shows that in February 1991, when Mobley was retiring and his assistant, Hicks, was assuming command of the detective division, Hicks, Mobley, and Wilson discussed the question of which officer to move into Hicks's previous assistant-command slot. Hicks suggested Ward, who at that time was a lieutenant in the division in charge of the crimes-against-persons bureau. However, both Mobley and Wilson felt that Ward's work performance had recently suffered from certain personal problems he was having, and that he might not be suited to a command role in the detective division. Thus Ward was transferred to a lieutenant position in the traffic division, and a traffic lieutenant was brought in to act as assistant commander of the detective division.[64] Although the court has refused to credit explanations given by Wilson and, in one case, Mobley, for acts which the court found were retaliatory, here it relies on the testimony of Hicks, who was both a credible witness and a good friend of Ward's. Hicks testified that Ward had indeed been undergoing a difficult time in his personal life, and that these problems had seeped into his work. Given this and given the absence of any other evidence suggesting a link between Ward's involvement in this litigation and Wilson's decision, the court believes that it is more likely than not that his non-selection as assistant commander of the detective division and his transfer to the traffic division were attributable to perceptions about his personal problems rather than his exercise of any first-amendment freedoms.

Retaliation was therefore not a substantial motivating factor in Folmar's and Wilson's actions toward Ward over the years. Ward is not entitled to any relief.

---

63. Indeed, Folmar's confrontation with Ward in late 1985, in which Folmar indicated he had heard rumors that Ward did not exercise sufficient authority over his subordinates, suggests that the mayor's impressions of Ward's performance—however unreliable may have been the sources of his information—was closer to the heart of his reason for not promoting Ward up to that point.

64. Whether, as the plaintiffs claim, such a move was counterproductive from a law enforcement point of view, it was not so irrational as to convince the court that it must have been based on a reason having nothing to do with the legitimate needs of the department.

### C. Application of the Law to Remaining Five Plaintiff Class Members

The court finally considers the testimony of those five officers who claim that Folmar and Wilson retaliated against them but who seek no relief in this litigation. As explained below, the court is not convinced that these officers have been victims of retaliation.

#### 1. Benefield

After six years with the department, Larry Benefield retired as a corporal in March 1990. According to the plaintiffs, he decided to leave in the wake of being transferred by Wilson to an undesirable assignment because of his active participation in the Fraternal Order.[65] Plaintiffs also contend that Benefield's recent request to be rehired by the department was rejected by Wilson for similar reasons. The court, however, finds that the evidence offered with respect to Benefield indicates that neither of these decisions were initially made by Wilson. The court credits Benefield's testimony that during at least one meeting with Wilson in 1989, the chief criticized his extensive involvement in the Fraternal Order, telling Benefield that he was "outspoken" and kept company with the "wrong friends." However, Benefield's January 1990 transfer from the patrol to the records and communications division was actually engineered by the records and communications commander, who selected Benefield's and one other corporal's name from a list of prospective transfer candidates as the best officers to fill two openings in his division. Similarly, the recent decision not to reemploy Benefield was arrived at not by Wilson but by a vote of all the majors in the Department. Folmar and Wilson's treatment of Benefield was not motivated by retaliation.

#### 2. Bird

Don Bird, a 14-year veteran of the department, currently serves as a corporal in the detective division. Plaintiffs appear to have offered his testimony to show Folmar's efforts to pressure officers to secretly convey to him information about goings-on in the department. In 1982 and 1983, one of Folmar's former personal aides met with Bird on several occasions, urging him to keep the mayor abreast, through the aide, of events of interest occurring in the Department. The aide indicated to him that such cooperation would increase Bird's future promotion opportunities, and also suggested that Bird would also have a greater chance of being promoted were he to resign from the Fraternal Order. Bird gave the aide several "tips" on matters he observed or overhead, and at least some of these were passed on to Folmar. Eventually however, Bird stopped giving information to the aide. Bird suggests he was not subsequently promoted because he ceased acting as an informant for Folmar. Yet the evidence demonstrates that Bird received relatively poor ratings throughout his tenure, and that he was never sufficiently highly rated for his name to be submitted to Folmar for consideration for promotion.[66] Furthermore, Bird did not indicate he initiated his confidential relationship with Folmar's aide because he felt pressured with respect to his prospects for promotion; rather, his testimony suggested he acted out of a desire to be helpful, and only later suffered second thoughts.[67] Folmar and Wilson's failure to promote Bird was not motivated by retaliation.

#### 3. R. Hankins

In 1990, Robert Hankins retired as a lieutenant after 15 years with the department. Prior to his departure, he had

---

65. Benefield was a member of the organization throughout his tenure with the department, and also held several offices in the Fraternal Order.

66. Although, as the court has noted, Folmar often exerted active control over the ratings meted out by senior officers, the court is not convinced that he influenced Bird's ratings.

67. It is beyond dispute that a public employee may make out a first-amendment claim by demonstrating that he was coerced by his employer into expressive or associational activity, through threats or offers of reward in connection with his employment. *See Branti v. Finkel,* 445 U.S. 507, 516–17, 100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574 (1980).

worked for several years in the administrative division, where his duties principally involved the police budget and finances. His own claim apparently relates to an investigation he performed in November 1989 of alleged mismanagement of petty cash by officers in the narcotics and intelligence bureau. The findings Hankins made in his investigation report suggested that some of these problems were attributable to corruption among the bureau's officers. According to Hankins, such charges of corruption were publicized in the local media and were politically embarrassing to Folmar and Wilson. As a result, he was purportedly stripped of certain responsibilities—for example, he was no longer permitted to participate in internal investigations. Wilson himself acknowledges that he disapproved of the report, complaining that Hankins "drew conclusions" instead of simply reporting facts. Upon consideration, the court believes Hankins's claim may have merit, but that the evidence now before the court is insufficient to draw reliable inferences regarding whether the report may be characterized as addressing a matter of public concern, whether Hankins actually suffered any tangibly adverse treatment, or whether, if his duties were limited in a detrimental manner, this occurred because of the report.[68]

#### 4. Henderson

The story of the difficulties officer Mike Henderson has suffered in his 14 years with the department is a terribly unfair one; however, it does not give rise to any federal constitutional violation. His efforts to rise in the department—particularly in December 1989, when he was recommended by his supervisor for the rank of corporal, but the recommendation was vetoed by Wilson—have been constantly frustrated, apparently because of the unexplained, vitriolic animosity that Folmar bears for Henderson.[69] In 1978 and again in 1988, Folmar has confronted Henderson and, for no apparent reasons, screamed at him in outrage, accusing Henderson of having a terrible attitude, and promising him that as long as Folmar was mayor, he would never be promoted. Although sympathetic to Henderson's apparently Kafkaesque fate, the court is not convinced that such treatment was motivated by any first-amendment activity on his part.

#### 5. Pierce

■ Corporal Mark Pierce, a 10-year veteran of the department, now serves in the training division. He claims that Folmar and Wilson have blocked him from obtaining a promotion because he disagreed with his supervisor, a former aide to the mayor, over the investigation of a traffic accident in 1987. This does not state a first-amendment retaliation claim, for the "speech" for which Pierce was allegedly punished clearly did not relate to a matter of public concern. Moreover, the court is not convinced that the incident has served a motivating factor in Folmar's and Wilson's actions toward him.

### III. DISCUSSION OF THE PATTERN-AND-PRACTICE CLAIM

■ In order to prevail on this classwide pattern-and-practice claim, plaintiffs must do more than provide evidence of mere "isolated, or 'accidental' or sporadic discriminatory acts." *Teamsters United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). Rather, they must prove by a preponderance of the evidence that retaliation for first-amendment activities was Folmar's and Wilson's "standard operating procedure—the regular rather than the unusual practice," *id.*, they must prove "a systemwide pattern and practice." *Id.* The record before the court falls far short of establishing that Folmar and Wilson have engaged in a pattern and

---

**68.** In any event, even if Robert Hankins's claim has merit, the court remains convinced that the plaintiffs have failed to establish their pattern-and-practice claim of retaliation based on expression and association, and the court would reach the same result as to all individual claims.

**69.** Folmar and Wilson sought to justify their negative opinions of Henderson by arguing that his professional appearance and demeanor are poor. However, regardless of whether and, if so, to what extent this may be true, it does not come close to explaining Folmar's hostility toward Henderson.

practice of retaliating against officers because of their expression and association. Admittedly, there are some isolated instances. These instances are, however, few and, of these, many are stale. The court is not convinced that such retaliation is the standard operating procedure within the Police Department.

The evidence is, however, overwhelming that retaliation against officers who have participated in *Jordan v. Wilson,* civil action no. 75–19–N, *United States v. City of Montgomery,* civil action no. 3739–N, and *Eiland v. City of Montgomery,* civil action no. 84–T–120–N, is the standard operating procedure.[70] The list of victims is lengthy and growing: Pierce–Hanna, Lisenby, Benjamin, Gamble, Williams, Tommi Lee Alford, Ed Alford, Green, and Knox. The list should also include the six officers—Lois Caffey, Mable Pierce, Jimmetta Brown, Margie McDonald, Nadine Childrey, and Eula Oliver—who were the victims of the defendants' bad-faith refusal to comply with a 1988 consent decree. Folmar's flagrant refusal to comply with the 1988 decree was driven by the same retaliatory bias.

## IV. RELIEF

■ As a partially prevailing party, Green is entitled to backpay and other back employment benefits he would have received had he not been denied a promotion in June 1988. He is also entitled to have his employment records reflect his promotion as of June 1988. The court will give the parties an opportunity to agree upon back benefits. If the parties cannot agree, then the court will determine the appropriate relief based on evidence submitted.

■ Benjamin is entitled to whatever relief is necessary to bring to an end his exile from the Montgomery Police Department and to provide full redress for all of the past and present effects of the defendants' retaliation against him. The court will give the parties an opportunity to agree upon his relief. If they cannot, then the court will fashion appropriate relief after having had input from the parties.

■ The plaintiffs are entitled to an injunction prohibiting the defendants from retaliating against officers in the Montgomery Police Department who participate in litigation against the defendants in the following cases: *Jordan v. Wilson,* civil action no. 75–19–N, *United States v. City of Montgomery,* civil action no. 3739–N, and *Eiland v. City of Montgomery,* civil action no. 84–T–120–N. Furthermore, in view of Folmar's and Wilson's past conduct as well as their retaliation against Ed Alford because of the testimony he gave in support of Green and Hankins, the court believes a similar injunction should be entered with regard to the instant litigation, that is, *Green v. City of Montgomery,* civil action no. 88–T–1160–N. Admittedly, the court has restricted the reach of its injunction to only these four cases. The court is, however, reluctant for two reasons to issue an injunction, open-ended both in time and subject-matter, as to cases yet unfiled. First, no one can predict the circumstances of future cases. They can obviously take many forms and present many issues, some perhaps meritorious and some perhaps frivolous, and some perhaps related to employment matters and some not. Second, it appears to the court that, if issues of retaliation arise in future cases, the issues can be handled in those cases or in separately filed cases specifically tailored to address the issues. The plaintiffs are not entitled to an injunction which reaches beyond the specific matters presented in the instant litigation.[71]

---

**70.** It may be that the plaintiff class should be decertified to the extent the plaintiffs have failed or recertified but only to the extent they have prevailed. To the extent the plaintiffs have failed on their class claims it could be argued that they have also failed to establish the overarching scheme necessary to hold the class together. *See General Tel. Co. v. Falcon,* 457 U.S. 147, 157–59 & ns. 13 & 15, 102 S.Ct. 2364, 2370–

71 & ns. 13 & 15, 72 L.Ed.2d 740 (1982). If the defendants desire that the court revisit the class certification issue, they should file an appropriate motion within 28 days.

**71.** Even without the class-wide relief, Green himself would still be entitled to such prohibitory injunctive relief. For, "where there is abundant evidence of consistent past discrimi-

■ The court recognizes that the plaintiffs have repeatedly requested that the court place the Montgomery Police Department in some type of receivership. The evidence does not in any way justify such an extraordinary and intrusive measure. The plaintiffs have prevailed on only the limited issue of retaliation for litigation, and, as the record before the court reflects, this issue has already been fully addressed in interim-promotion and interim-selection plans adopted in *Jordan v. Wilson*, civil action no. 75–19–N, *United States v. City of Montgomery*, civil action no. 3739–N. Moreover, the parties in those two cases have begun the difficult task of developing permanent personnel procedures for the department, and recent litigation concerning some of these procedures reflects that the court and the parties are continuing to address the issue of retaliation. *See United States v. City of Montgomery*, 775 F.Supp. 1450 (M.D.Ala.1991) (court carefully considered the issue of retaliation before approving new permanent promotion procedures for rank of sergeant).

Finally, the plaintiffs are entitled to reasonable attorney's fees and expenses. 42 U.S.C.A. § 1988. Again, the court will give the parties an opportunity to agree upon them. If the parties cannot agree, then the court will determine what fees and expenses to award.

An appropriate judgment will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiff David Green and against the defendants, the City of Montgomery, Alabama and its mayor and police chief;

(2) That the defendants, the City of Montgomery and its mayor and police chief, and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing to promote plaintiff Green to the rank of major retroactive to June 1988;

(3) That plaintiff Green have and recover from the defendants, the City of Montgomery and its mayor and police chief, such backpay and other back employment benefits he would have received had he not been illegally denied a promotion in June 1988;

(4) That, if the parties cannot agree on appropriate back benefits, plaintiff Green is allowed 28 days from the date of this order to file a request for the court to determine these benefits;

(5) That all other relief which is sought by plaintiff Green for himself and is not granted herein, be and it is hereby denied;

(6) That judgment be and it is hereby entered in favor of plaintiffs Green and Jerry Hankins and against the defendants, the City of Montgomery, Alabama and its mayor and police chief, as to plaintiff-class-member Lonnie Benjamin;

(7) That the defendants, the City of Montgomery and its mayor and police chief, and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing to take "appropriate measures" to redress fully all of the past and present effects of their retaliation against plaintiff-class-member Benjamin;

(8) That, if the parties cannot agree on the "appropriate measures," plaintiffs Green and Hankins are allowed 28 days from the date of this order to file a request for the court to determine the measures;

(9) That the issue of whether plaintiff-class-members Ed Alford and Jere Knox are entitled to recover in this cause be and it is hereby set for submission, without oral argument, on April 30, 1992, with plaintiffs Green and Hankins to file their brief and

nation injunctive relief is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law." *Lewis v. Smith,* 731 F.2d 1535, 1540 (11th Cir.1984).

any evidentiary materials by April 16, 1992, and the defendants to do the same by April 30, 1992;

(10) That judgment be and it is hereby entered in favor of the plaintiffs Green and Hankins and against defendants, the City of Montgomery, Alabama and its mayor and police chief, on the plaintiffs' claim of a "pattern and practice" of retaliation for "participation in litigation";

(11) That the defendants, the City of Montgomery and its mayor and police chief, and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each EN-JOINED and RESTRAINED from retaliating against those within the department who have in the past participated, are participating, or will participate in the future in any of the following litigation: *Jordan v. Wilson*, civil action no. 75–19–N; *United States v. City of Montgomery*, civil action no. 3739–N; *Eiland v. City of Montgomery*, civil action no. 84–T–120–N; and *Green v. City of Montgomery*, civil action no. 88–T–1160–N;

(12) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against the plaintiffs Green and Hankins on their claims of a "pattern and practice" of retaliation for "expression" and "association";

(13) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiff Hankins to the extent he seeks relief for himself, with plaintiff Hankins taking nothing by his complaint to this extent;

(14) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member James Bates, with the plaintiffs taking nothing by their complaint as this class member;

(15) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor

and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Steve Brantley, with the plaintiffs taking nothing by their complaint as this class member;

(16) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Randall Brown, with the plaintiffs taking nothing by their complaint as this class member;

(17) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Clarence Burson, with the plaintiffs taking nothing by their complaint as this class member;

(18) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member James Gamble, with the plaintiffs taking nothing by their complaint as this class member;

(19) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Ken Hitson, with the plaintiffs Green and Hankins taking nothing by their complaint as this class member;

(20) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Irma Lisenby, with the plaintiffs taking nothing by their complaint as this class member;

(21) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Frank Mitchell, with the plaintiffs

taking nothing by their complaint as this class member;

(22) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member William Moore, with the plaintiffs taking nothing by their complaint as this class member;

(23) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs Green and Hankins as to plaintiff-class-member Robert Ward, with the plaintiffs taking nothing by their complaint as this class member;

(24) That plaintiffs Green and Hankins have and recover from the defendants, the City of Montgomery and its mayor and police chief, reasonable attorney's fees and expenses; and

(25) That, if the parties cannot agree on reasonable attorney's fees and expenses, plaintiffs Green and Hankins are allowed 28 days from the date of this order to file a request for the court to determine such fees and expenses.

The clerk of the court is DIRECTED to issue a writ of injunction.

The United States Marshal or his representative is DIRECTED to serve on the City of Montgomery, Alabama and its mayor and police chief a copy of the memorandum opinion and the judgment and injunction entered this day.

### ORDER

In the memorandum opinion entered on March 27, 1992, the court found that the defendants had violated the first-amendment rights of plaintiff-class-members Ed Alford and Jere Knox. The court was, however, preliminarily of the view that it should still find in favor of the defendants because the two class members were no longer with the police department and thus injunctive relief would not benefit them. The court gave the plaintiffs until April 16, 1992, to show how the two class members are entitled to relief. The plaintiffs have now acknowledged that they cannot point to any allowable relief to which the class members would be entitled. Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs David Green and Jerry Hankins as to plaintiff-class-member Ed Alford, with the plaintiffs Green and Hankins taking nothing by their complaint as to this class member; and

(2) That judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiffs David Green and Jerry Hankins as to plaintiff-class-member Jere Knox, with the plaintiffs Green and Hankins taking nothing by their complaint as to this class member.

Furthermore, counsel for plaintiffs having acknowledged that they will not be presenting any additional individual claims based on the court's finding in its memorandum opinion and judgment entered on March 27, 1992, of a "pattern and practice" of retaliation for "participation in litigation," it is the ORDER, JUDGMENT, and DECREE of the court that no further individual claims are allowed based upon said finding.

DONE, this the 17th day of April, 1992.